**FRANKFORT DISTILLERIES, Inc., v. UNITED STATES, and nine other cases.**

Nos. 2792–2799, 2807, 2808.

Circuit Court of Appeals, Tenth Circuit.

Aug. 26, 1944.

Writ of Certiorari Granted, in all cases except Nos. 2807 and 2808,*

Nov. 13, 1944.

See 65 S.Ct. 132, 133.

*No. 2807 United States v. Safeway Stores, Inc., writ of certiorari denied Nov. 6, 1944.  See 65 S.Ct. 121; No. 2808, U. S. v. Kroger Grocery & Baking Co., writ of certiorari denied Nov. 20, 1944.  See 65 S.Ct. 188.

W. W. Grant, of Denver, Colo. (Morrison Shafroth and Henry W. Toll, both of Denver, Colo., on the brief), for appellants Frankfort Distilleries, Inc., Seagram-Distillers Corporation, McKesson & Robbins, Inc., and J. E. Speegle.

Morris Rifkin, of Denver, Colo., on the brief, for appellant J. E. Speegle.

William V. Hodges, of Denver, Colo., (Hodges, Vidal & Goree, of Denver, Colo., on the brief), for appellant National Distillers Products Corporation.

D. L. Street, of Louisville, Ky., and Peter Holme, and Robert E. More, both of Denver, Colo., on the brief for appellant Brown Forman Distillers Corporation.

Charles Rosenbaum, of Denver, Colo. (A. H. Stuart, of Detroit, Mich., Newell W. Ellison, of Washington, D. C., Richard S. Goldman, of San Francisco, Cal., and Edward Miller, of Denver, Colo., on the brief), for appellant Hiram Walker, Inc.

Robert S. Marx, of Detroit, Mich. (Ralph T. Heymsfeld, of New York City, George R. Beneman, of Washington, D. C., Ira C. Rothgerber and Rothgerber & Appel, all of Denver, Colo., and Nichols, Wood, Marx & Ginter, of Cincinnati, Ohio, on the brief), for appellant Schenley Distillers Corporation.

George B. Haddock, Sp. Asst. to Atty. Gen. (Don W. Marshall, Sp. Atty., of Denver, Colo., Wendell Berge, Asst. Atty. Gen. and Thomas J. Morrissey, U. S. Atty., of Denver, Colo., on the brief), for the United States in Nos. 2792 to 2799.

Gail L. Ireland, Atty. Gen., H. Lawrence Hinkley, Deputy Atty. Gen., Duke W. Dunbar, 1st Asst. Atty. Gen., and George K. Thomas, Asst. Atty. Gen., on the brief of amicus curiae in Nos. 2792 to 2799.

Holmes Baldridge, Sp. Asst. to Atty. Gen. (Wendell Berge, Asst. Atty. Gen., George H. West, U. S. Atty., of Topeka, Kan., and Horace L. Flurry and Earl A. Jinkinson, Sp. Assts. to Atty. Gen., on the brief), for the United States in Nos. 2807 and 2808.

Henry N. Ess, of Kansas City, Mo. (Mitchell T. Neff, of San Francisco, Cal., and Louis R. Gates, of Kansas City, Kan., on the brief), for appellees Safeway Stores, Inc. (Maryland), et al.

Robert S. Marx, of Detroit, Mich., and Thomas M. Lillard, of Topeka, Kan. (Frank E. Wood and Nichols, Wood, Marx & Ginter, all of Cincinnati, Ohio, and Lillard, Eidson, Lewis & Porter, of Topeka, Kan., on the brief), for appellees Kroger Grocery & Baking Company et al.

Before PHILLIPS, BRATTON, HUXMAN, and MURRAH, Circuit Judges.

BRATTON, Circuit Judge.

These are three criminal prosecutions for combining and conspiring, in some counts to restrain interstate trade and commerce, and in others to monopolize such trade and commerce, in violation of the Sherman Act, as amended, 26 Stat. 209, 50 Stat. 693, 15 U.S.C.A. §§ 1, 2. The cases were submitted on rehearing to the full court. The opinions previously announced, for the unanimous court in one instance and for the majority in the other, are withdrawn and the following is substituted in lieu of them.

The indictment in Numbers 2792 to 2799, inclusive, containing two counts, was returned in the United States Court for

Colorado against twenty-nine corporations and fifty-four individuals. Nineteen of the corporations are engaged in the production of alcoholic beverages outside of Colorado; eight are wholesalers engaged in the business in Colorado of purchasing alcoholic beverages for resale to retailers; one is a wholesale association, the members of which are wholesalers doing business in the state, hereinafter referred to as Wholesale Association; and one is a retail association, the members of which are retailers engaged in business in the state, hereinafter called Package Association. Some of the individuals are or were officers or employees of the defendant producers; some are or were officers or employees of the defendant wholesalers; and some are engaged in the sale and distribution at retail of alcoholic beverages in Colorado. The first count was dismissed.

The second count charges a conspiracy to raise, fix, and maintain the retail prices of alcoholic beverages shipped into Colorado. It defines certain terms and delineates the facts with respect to the several defendants as to being producer, wholesaler, retailer, officer, or employee, respectively. It contains a description of the nature of the trade and commerce involved. Under this head, it sets out that alcoholic beverages are marketed in Colorado by means of a continuous flow of shipments from producers located outside the state through wholesalers and retailers to the consuming public; that beverages shipped and sold in bottles by producers can be sold to retailers there only by wholesalers licensed under the laws of that state; that wholesalers and retailers are conduits through which beverages are shipped into the state and sold and distributed to the consuming public; that more than ninety-eight per cent of the spirituous liquor, more than eighty per cent of the wine, and substantial amounts of beer, consumed in Colorado are produced elsewhere and shipped into the state for sale and distribution; that alcoholic beverages are distributed to more than 700 retailers in the state by approximately twenty-eight wholesalers; that more than seventy-five per cent of the spirituous liquor and wine, and substantial quantities of beer, are sold and distributed by the defendant wholesalers; and that all of the liquor and wine, and substantial quantities of beer, sold and distributed by the bottle or case to the consuming public, are sold by retailers, including the defendant retailers and other members of the defend-

ant Package Association. It is then charged that beginning about January, 1936, and continuing to the time of the presentation of the indictment, the defendants combined and conspired to raise, fix, and maintain the retail prices of alcoholic beverages shipped into Colorado from producers located outside the state, by raising, fixing, and stabilizing retail mark-ups and margins of profit; that it was a part of the combination and conspiracy that the defendants from time to time discuss, agree upon, and adopt high, arbitrary, and non-competitive retail prices, mark-ups, and margins of profit; that the defendants Wholesale Association and Package Association, wholesalers, and retailers agree upon and undertake to persuade, induce, and compel producers, including the defendant producers, and wholesalers, to enter into fair trade contracts affecting every type and brand of alcoholic beverage shipped into Colorado and to establish in and by such contracts high, arbitrary, and artificial, retail prices embodying the high, arbitrary, and non-competitive margins of profit agreed upon; that the defendant Package Association prepare and adopt forms of fair trade contracts acceptable to the defendant retailers and to the other members of the association; that the defendant Package Association agree with producers and wholesalers on the forms of fair trade contracts to be used by such producers and wholesalers, and prepare and circulate among its members bulletins and notices announcing the adoption of fair trade contracts and giving the names of producers and wholesalers entering into them and also the names of those not doing so; that the defendant retailers, through the defendant Package Association, agree to and do patronize only those producers and wholesalers who enter into fair trade contracts embodying such retail prices, mark-ups, and margins of profit, and who require and compel observance of the minimum retail prices established in that manner, agree to and do withhold their patronage from producers and wholesalers who fail or refuse to enter into such fair trade contracts, and agree from time to time with producers and wholesalers respecting revisions in the retail prices established in and by such fair trade contracts so as to preserve and maintain the retail mark-ups and margins of profit. It is further charged that the defendants, acting in part through the defendants Wholesale Association and Package Association agree to and do police the high, ar-

bitrary, and non-competitive retail prices, mark-ups, and margins of profit, and require and secure observance of them; that they agree to and do employ paid executives and investigators to spy upon and embarrass retailers who fail or refuse to observe such retail prices, mark-ups and margins of profit, and threaten to and do institute and cause to be instituted legal proceedings against such retailers who fail or refuse to observe such prices, mark-ups, and margins of profit. It is also charged that the defendant retailers agree among themselves and with the defendant producers and the defendant wholesalers that retailers selling at prices lower than those established in the fair trade contracts be deprived of the opportunity to purchase beverages from the defendant producers and the defendant wholesalers; that the defendant retailers threaten to and do boycott producers and wholesalers who supply their products to retailers failing or refusing to observe the retail prices, mark-ups, and margins of profit; that in order to reduce price competition among retailers, defendant retailers, acting in part through defendant Package Association, agree and attempt to persuade and induce the authorized officials of Colorado, and of the City and County of Denver, to reject applications for retail liquor licenses; and that for the purpose of financing such activities, defendants agree upon and provide for the collection of an extra charge added to the wholesale price, the proceeds to be paid to the Wholesale Association and that it then pay a portion of such proceeds to the Package Association. And it is charged that the effect of the combination and conspiracy has been to raise, fix, stabilize, and maintain the retail prices of alcoholic beverages shipped in interstate commerce into Colorado and sold and distributed in that state at levels acceptable to the defendants, to eliminate price competition among the defendant retailers, to eliminate price competition among the members of the Package Association, and to restrain and suppress interstate trade and commerce in alcoholic beverages not covered by fair trade contracts.

After their demurrers and motions to quash the indictment had been denied, the defendants Frankfort Distilleries, Inc., National Distillers Products Corporation, Brown Forman Distillers Corporation, Hiram Walker, Incorporated, Schenley Distillers Corporation, Seagram-Distillers Corporation, McKesson & Robbins, Incorpo-

rated, and J. E. Speegle each entered a plea of nolo contendere and prayed that the court impose sentence in all things as though a plea of guilty had been interposed. Fines were imposed, and separate appeals were perfected.

The indictment in Number 2807, containing two counts was returned in the United States Court for Kansas against Safeway Stores, Inc., incorporated in Maryland, Safeway Stores, Inc., incorporated in California, Safeway Stores, Inc., incorporated in Nevada, Safeway Stores, Inc., incorporated in Texas, Arizona Grocery Company, Sanitary Grocery Company, Dwight Edwards Company, the Lucerne Cream and Butter Company, Sutter Packing Company, and certain individuals being officers of such corporations, respectively.

The first count sets out that the defendant Safeway Stores, Inc., incorporated in Maryland, is a holding company and owns and controls all of the authorized and issued stock of the other corporate defendants, the time and manner of the acquisition being detailed; that in 1926 the Safeway group owned and operated in the United States 673 food stores, of which 120 were equipped with meat markets, and had sales of $50,536,514; that in 1932, the group owned and operated in the United States and Canada 3411 stores in which were located 2066 markets, and their sales amounted to $229,173,468; that in 1939, they owned and operated in the United States and Canada 2967 stores in which 2643 markets were located, and their sales were $385,882,083; that at the end of 1941, they owned and operated in the United States about 2850 stores of which about 2500 had markets; that their sales for that year totaled $423,787,700.21; that they had fifty-two principal warehouses, nineteen bakeries, seven creameries, and seven coffee roasting plants; that the wholesale warehouses and retail stores were divided into fourteen geographical divisions and the divisions subdivided into fifty-eight districts, the names of the divisions and districts, the number of warehouses, groceries, and bakeries in each being stated in detail; that the members of the group together constitute the second largest manufacturers, processors, wholesalers, and retail distributors of food and food products in the United States; and that in addition to manufacturing, processing, canning, and packing food and food products for sale in their retail stores, the group obtains fresh fruits

and vegetables from jobbers in various markets where they are located and ships them in interstate commerce to their warehouses which in turn distribute them to their retail stores for sale to consumers. It is further set out that by virtue of the horizontal and vertical integration of the functions and business of the group, and the centralization of the control thereof, the defendants have exercised the power to dominate and control the production, prices, and distribution of a substantial part of the food and food products produced, marketed, sold, and consumed in the United States.

It is then charged that for many years prior to the return of the indictment, and continuously up to its presentment, the defendants and others to the grand jury unknown entered into a combination and conspiracy to restrain interstate trade and commerce in food and food products, produced, distributed, and sold in many states. It is further charged that such combination and conspiracy consists of a continuing agreement and concert of action in acquiring by merger and otherwise the business of independent retail grocers and local chains; selecting local areas in which defendants use their dominant advantage to injure and destroy the competition of independent grocers, meat dealers, and small local food stores, by selling at retail in those areas sufficiently lower than elsewhere until control or the desired percentage of total retail business is obtained, using income from other areas and from operations other than retail to offset the losses or reductions in profits incident to such price cutting; combining with other national food chains operating in such selected areas to fix, maintain, and follow the prices established by the defendants; systematically preventing competition in selected trade areas, by combining with independent grocers and local and national food chains operating in such selected areas to fix retail prices and terms of sale of food, and by combining with manufacturers of food and food products and others to fix and maintain the resale prices and policies in such selected areas and to aid and assist such manufacturers and others in enforcing the prices fixed and established; obtaining and maintaining for themselves a systematic discriminatory buying preference over competitors by coercing suppliers to sell to other wholesalers and retailers on terms and conditions dictated by defendants, coercing suppliers— through threats of withdrawal of their patronage and otherwise—secretly to maintain two price structures on their products, the lower of which would be charged to defendants and the higher to their competitors, requiring suppliers to give defendants secret preferential discounts and secret protection against price increases and declines, coercing suppliers to discontinue selling direct to their competitors while secretly continuing to sell direct to defendants at lower prices, inducing suppliers to divert a large portion of their plants and facilities to filling orders of defendants and then threatening to withdraw their patronage unless secretly given lower prices and large discounts, bidding in fresh fruits and produce at public auction on the secret understanding with the owner that settlement would be made at a lower price than that bid, coercing suppliers to grant preferential rebates by various pretexts unrelated to any actual saving or service to the supplier; systematically exacting from suppliers arbitrarily fixed rebates called "advertising" and "promotional" allowances for pretended services, demanding discounts and allowances for so-called "floor space rentals," "Store Sales Service," "feature payments," "label and container allowances," "Sign space rentals," and "mass displays" for mere pretended service; and fostering false comparisons of their prices with the prices charged by competitors and false reports calculated to conceal their activities and perpetuate their dominance and control of the distribution of food and food products; inspiring and publishing statements calculated and intended to foster such false comparisons, organizing, financing, and preparing publicity and propaganda for false front farmer, consumer, and housewife organizations and using the statements of such organizations in support of such false comparisons, and the systematic practice of secretly enhancing their actual prices above the advertised prices through short-changing, short-weighing, and marking up prices on store tags and purchases. And it is charged that the effect of such combination and conspiracy has been unreasonably to restrain a large part of the interstate trade and commerce in food and food products.

With minor exceptions which do not have any material bearing here, the second count charges the same facts as a conspiracy to monopolize trade and commerce, injure food manufacturers, processors, canners, wholesalers, and retail dealers, depress prices paid growers of fruits, vegetables, and other farm products, vest in de-

fendants dominance and control of the distribution of food and food products in many of the largest trade areas in the United States, and make it impossible for any one not similarly intergrated to enter or remain in competition with defendants.

The trial court sustained in part a demurrer to the indictment, treated the infirmities as fatal, and dismissed the indictment as to the demurring defendants. The United States appealed.

The indictment in Number 2808, containing two counts, was also returned in the United States Court for Kansas. It was against The Kroger Grocery & Baking Company, Wesco Foods Company, The Colter Company, Pay'n Takit, Inc., and certain individuals being officers of the corporations, respectively. It sets out that The Kroger Grocery & Baking Company owns the stock in the other corporate defendants, and in addition has acquired through merger and otherwise the business of forty-nine independents and local chains, the names, locations, dates of acquisition, and number of stores aggregating 2317, being detailed; and that the members of the group together constitute the third largest manufacturers, processors, wholesalers, and retail distributors of food and food products in the United States. It further sets forth the number and location of the processing plants and stores operated, and the location and volume of business transacted. The first count charges a conspiracy to restrain interstate trade and commerce in food and food products, produced, distributed and sold in many states, and the second count charges a like conspiracy to monopolize such trade and commerce. The indictments in the two cases in Kansas are substantially alike in their material features.

In this case, the trial court similarly sustained in part a demurrer to the indictment, regarded the defects as fatal, and dismissed the indictment as to the demurring defendants. From the order of dismissal, the United States appealed.

■ One ground of demurrer in each case, denied by the court in Colorado, and sustained by the court in Kansas, was that the indictment was bad for vagueness, indefiniteness, and uncertainty. It is too well settled for doubt that an indictment is not objectionably vague, indefinite, and uncertain if it charges all of the essential elements of the offense with sufficient fullness, clarity, and particularity to advise the accused of the nature of the accusation

against him, to enable him to prepare his defense, and to enable him to plead the judgment and record of acquittal or conviction in bar to a subsequent prosecution for the same offense. Evans v. United States, 153 U.S. 584, 14 S.Ct. 934, 38 L.Ed. 830; Cochran and Sayre v. United States, 157 U.S. 286, 15 S.Ct. 628, 39 L.Ed. 704; Rosen v. United States, 161 U.S. 29, 16 S.Ct. 434, 480, 40 L.Ed. 606; Bartell v. United States, 227 U.S. 427, 33 S.Ct. 383, 57 L.Ed. 583; United States v. Behrman, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619; Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545; Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861; Weber v. United States, 10 Cir., 80 F.2d 687; Crapo v. United States, 10 Cir., 100 F.2d 996; Graham v. United States, 10 Cir., 120 F.2d 543; Rose v. United States, 10 Cir., 128 F.2d 622; United States v. Armour & Co., 10 Cir., 137 F.2d 269.

■ Ordinarily it is not sufficient to charge the offense in the words of the statute creating the offense, unless the words themselves fully, directly, and expressly, without uncertainty or ambiguity, set forth all the essential elements necessary to constitute the crime intended to be punished. United States v. Carll, 105 U.S. 611, 26 L.Ed. 1135; United States v. Britton, 107 U.S. 655, 2 S.Ct. 512, 27 L.Ed. 520. Where the statute is general in terms and fails fully, directly, and expressly to set forth with certainty and without ambiguity all of the essential elements necessary to constitute offense, the indictment must descend to particulars and charge every constituent ingredient of which the crime is composed. United States v. Cruikshank et al., 92 U.S. 542, 23 L.Ed. 588; United States v. Hess, 124 U.S. 483, 8 S.Ct. 571, 31 L.Ed. 516; Evans v. United States, supra; Moore v. United States, 160 U.S. 268, 16 S.Ct. 294, 40 L.Ed. 422; Manley v. Georgia, 279 U.S. 1, 49 S.Ct. 215, 73 L.Ed. 575.

■■ The Sherman Act is couched in general language, it speaks in generic terms, and it fails to enter into details. It "has a generality and adaptability comparable to that found to be desirable in constitutional provisions." Appalachian Coals, Inc., v. United States, 288 U.S. 344, 53 S.Ct. 471, 474, 77 L.Ed. 825. It therefore is necessary that an indictment charging an offense under its provisions descend to particulars and allege the constituent ingredients of which the crime is composed. United States v. Armour & Co., supra. But these

indictments charge in the language of the Act that the defendants formed and entered into the combination and conspiracy; and, obedient to the necessity of doing so, they descend to particulars and undertake to charge the essential elements of which the offense is composed. In short, the agreement to restrict or monopolize interstate commerce, as the case may be, is alleged in conformity with the Act, and the plans of the conspirators are set out in detail.

■ An indictment must be considered as a whole in determining whether it charges all of the essential elements of the offense sufficiently to inform the accused of the nature of the accusation, to enable him to prepare his defense, and to enable him to plead the judgment and record of acquittal or conviction in bar to a later prosecution for the same offense. All pertinent parts of it must be brought into view and considered in their totality. United States v. Armour & Co., supra.

■ In respect of time, the indictment in the case in Colorado charges in general terms that each of the allegations contained therein shall be deemed to refer to the period beginning on or about January, 1936, the exact date being unknown to the grand jurors, and continuing thereafter up to and including the date of the presentation of the indictment. And it contains a specific charge that beginning on or about January, 1936, the exact date being unknown to the grand jurors, and continuously thereafter up to and including the date of the presentation of the indictment, the defendants entered into and engaged in the combination and conspiracy. The indictments in the cases in Kansas, in each count, after describing the defendants and the nature and extent of the business, charge that for many years prior to the return of the indictment, and continuously up to and including the day of the presentation of the indictment, the defendants, and others to the grand jurors unknown, formed and carried out the combination and conspiracy. The gist of the offense under the Sherman Act is the agreement or confederation to restrain or monopolize interstate commerce, as the case may be. Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 252, 60 S.Ct. 811, 84 L.Ed. 1129. It is not exclusively a thing or entity of the very instant the minds of the parties come to a complete understanding, and no more. The purpose of the agreement is an essential element, and in its very essence it may contemplate that the operation shall extend over a period of time. If so, while the agreement continues, and while the parties are engaged in the operation of the design, they continue to transgress the statute. United States v. Kissel, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168; United States v. New York Great Atlantic & Pacific Tea Co., 5 Cir, 137 F.2d 459, certiorari denied 320 U.S. 783, 64 S.Ct. 191. These indictments each charge a continuing conspiracy. One fixes the beginning by a specific date; the other two fix it as many years prior to the presentation of the indictment; and all charge that it continued down to and including the date of the presentation of the indictment. That was sufficient in respect of time. United States v. Kissel, supra; United States v. American Medical Association, 72 App. D.C. 12, 110 F.2d 703, certiorari denied 308 U.S. 599, 60 S.Ct. 131, 84 L.Ed. 502; American Medical Ass'n v. United States, 310 U.S. 644, 60 S.Ct. 1096, 84 L.Ed 1411.

■ In respect of the place at which the combination or conspiracy was formed, the indictment in the case in Colorado charges that it was entered into and carried out in part in the District of Colorado, and that during the period of the conspiracy and within three years next preceding the presentation of the indictment, the defendants performed within such district many of the acts and things set forth in the indictment; and in each case in Kansas, the indictment charges that the combination and conspiracy was entered into and carried out in part in the District of Kansas, and within the First Division thereof, that a named defendant (Safeway Stores, Inc., a Nevada corporation, in one instance, and The Kroger Grocery & Baking Company, in the other) has retail food stores, offices, and agents and transacts business there, and that during the period of the combination and conspiracy, and within three years next preceding the presentation of the indictment, the defendants performed within such district and division many of the acts set forth in the indictment. More often than otherwise, a combination or conspiracy of the kind charged in these indictments is not formed or entered into by formal contract or other writing. It sometimes is not entered into wholly and completely at one time or place. It may be, and frequently is, pieced together and effected by contacts, conferences, verb-

al understandings, and arrangements, had and entered into at different times and places. The allegation that the conspiracy was entered into and carried out in part within the district in which the indictment was returned was sufficient in respect of place, as against an attack by motion or demurrer on the ground of complete infirmity of the indictment.

■ The indictment in the case in Colorado charges that the defendants conspired to raise, fix, and maintain the retail prices of alcoholic beverages shipped into the state, without specifying or describing the particular kind or kinds of beverages. It also charges that it was a part of the combination and conspiracy to persuade, induce, and compel producers and wholesalers to enter into fair trade contracts, without giving the names of such producers and wholesalers; and that the defendants employ paid executives and investigators to spy upon and harass retailers who fail or refuse to observe the retail prices, mark-ups, and margins of profit agreed upon, without naming the executives, investigators, or retailers. And it contains other charges comparable in point of generality. The indictment in each case in Kansas charges in the first count that the defendants conspired to restrain interstate trade and commerce in food and food products, and in the second count to monopolize such trade and commerce, without specifying or describing the kind or kinds of food and food products. They further charge that it was a part of the combination and conspiracy that the defendants acquire by merger and otherwise the business of independent retail grocers and local chains throughout the United States, without naming or giving the location of the grocers and chains; and that they select local areas throughout the United States in which they use their dominant advantage to injure and destroy competition of independent grocers, meat dealers, and small local food chains, without specifying the areas or naming the grocers, meat dealers, or food chains. And they contain other comparable charges not necessary to detail, with similar omissions. But these indictments each charge in general terms a conspiracy to restrain interstate trade and commerce, or to monopolize such trade and commerce, as the case may be, substantially in the language of the Act. And if the allegations in respect to the manner and means of effecting the object of the combination and conspiracy

are not set forth in sufficient detail, the remedy is to apply for a bill of particulars. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

■ Little need be said concerning the sufficiency of the indictments in respect to charging venue. In cases of this kind, jurisdiction is in the court of the district where the conspiracy was formed, or where some act pursuant to it took place. As already pointed out, the indictment in the case in Colorado charges that the combination and conspiracy was entered into and carried out in part within the district, and that the defendants performed there many of the acts and things set forth in the indictment. And the indictment in each case in Kansas contains like charges. These allegations—admitted by the demurrers—were enough to lay venue. Hyde v. United States, 225 U. S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann. Cas.1914A, 614; Brown v. Elliott, 225 U.S. 392, 32 S.Ct. 812, 56 L.Ed. 1136; United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; United States v. Socony-Vacuum Oil Co., supra; United States v. New York Great Atlantic & Pacific Tea Co., supra.

■ An additional ground of demurrer sustained in the cases in Kansas was that each count in the indictment was duplicitous, in that it attempted to charge more than one offense. The several counts each charge only a single crime—the conspiracy. The conspiracy as laid includes several acts and means of making it effective, but the crime is the entering into the combination. That is the unit, however varied the means and procedure of effectuating it. The several acts and means of making the conspiracy effective are related acts which enter into the crime, but still the single crime is that of combining and conspiring together to restrain interstate trade and commerce, or to monopolize such trade and commerce. Duplicity in an indictment means the charging of two or more separate and distinct offenses in one count, not the charging of a single offense into which several related acts enter as ways and means of accomplishing the purpose. Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23; United States v. New York Great Atlantic & Pacific Tea Co., supra.

■ Two additional questions remain for consideration concerning the indictment in the case in Colorado which are not present in the cases in Kansas. They are whether the Sherman Act any longer applies

to interstate commerce in intoxicating liquor, and whether the indictment charges a combination and conspiracy to restrict interstate trade and commerce or merely affects intrastate activities. The Twenty-first Amendment does not strip the national government of all authority to legislate in respect of interstate commerce in intoxicating liquor. Hayes v. United States, 10 Cir., 112 F.2d 417; Washington Brewers Institute v. United States, 9 Cir., 137 F. 2d 964. But it does sanction the right of a state to legislate concerning the importation of such liquor from other states, unfettered by the Commerce Clause. Ziffrin, Inc., v. Reeves, 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128; Cf. Carter v. Virginia, 321 U.S. 131, 64 S.Ct. 464. Aside from the diminution pro tanto which may be found in the Twenty-first Amendment in respect of the transportation of intoxicating liquor, a question unnecessary to determine here, Congress has plenary power under the Commerce Clause to regulate commerce among the states. And that power is not confined in all cases to the regulation of interstate commerce. It extends in sweep to intrastate activities which affect interstate trade, or the exercise of the power of Congress over it, in such manner as to make the regulation of such intrastate activities necessary and appropriate for the protection of the free flow of interstate commerce. United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430.

A combination or agreement for price maintenance or which operates directly on prices or price structures of commodities moving in interstate commerce constitutes an unreasonable restraint within the Sherman Act, without regard to whether the prices or price structures agreed upon are reasonable or otherwise, United States v. Trenton Potteries Co., supra; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Socony-Vacuum Oil Co., supra; United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; one not fixing prices but intended unreasonably to restrict or restrain interstate commerce, or which by its operation necessarily impedes the due course of such commerce, comes within the Act, Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963; one which contemplates restraint of interstate trade but to be effectuated by acts constituting

intrastate activities is met with the condemnation of the Act, Bedford Cut Stone Co. v. Journeymen Stone Cutters' Ass'n, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Local 167, International Brotherhood of Teamsters v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804; and one primarily local likewise finds itself within the ambit of the Act if the means adopted to effectuate it operate to lay a direct and undue burden on interstate commerce. Industrial Ass'n v. United States, 268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849. But a combination or concert limited in its objectives to intrastate activities, with no intent or purpose to affect intrastate commerce, is without the reach of the Act, even though there may be an indirect and insubstantial effect on interstate commerce. United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762; United Leather Workers' International Union v. Herkert & Meisel Trunk Co., 265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A.L.R. 566; Industrial Ass'n v. United States, supra; Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062.

Colorado has a Fair Trade Act, chapter 146, Laws of 1937; an Unfair Practices Act, chapter 261, Laws of 1937; and a Liquor Code, sections 15-47, chapter 89, Colorado Statutes Annotated 1935. Under section 1 of the Fair Trade Act a contract relating to the sale or resale of a commodity bearing the trade-mark, brand, or name of the producer or distributor, and which commodity is in free and open competition, shall not be deemed in violation of any law of the state by reason of providing that the buyer will not resell such commodity at less than the minimum price stipulated by the seller or that the buyer will require of any dealer to whom he may resell such commodity an agreement that he will not resell at less than the minimum prices stipulated by the seller. Section 3 of the Unfair Practices Act provides that it shall be unlawful for any one engaged in business in the state to sell, offer for sale, or advertise for sale, any article or product for less than the cost thereof to the vendor, or give, offer to give, or advertise the intent to give away any article or product for the purpose of injuring competitors and destroying competition. Section 17 of the Liquor Code, as amended by chapter 160, Laws of 1941, makes it unlawful wilfully and knowingly to advertise, offer for sale, or sell vinous liquors, spirituous liquors and

alcoholic beverages at less than the price stipulated in any contract entered into pursuant to the provisions of the Fair Trade Act; section 29 provides for a manufacturers' license, a wholesaler's license, and a retail liquor store license; and section 20, as amended by Laws 1941, c. 159, authorizes the licensing authority, created by the preceding section, to make rules and regulations pursuant to the licensing provisions. Regulation 1(3) promulgated under the Liquor Code provides that all spirituous liquor sold or transferred within the state must be affixed with the proper stamps before sale or transfer, and that wholesalers shall affix the proper stamps upon all liquor sold by them within the state to retailers or consumers prior to delivery; and regulation 12 C provides that all alcoholic liquor shall be the sole and exclusive property of and subject to the unrestricted power of disposal of a duly licensed Colorado wholesale dealer, as defined in the Liquor Code, at the time such liquor crosses the state line coming into the state for the purpose of being sold, offered for sale, or used there. These statutes and regulations are emphasized as constituting legal warrant for the fair trade agreements referred to in the indictment. And, justifying his appearance in the case by reference to the observation of the court in Washington Brewers Institute v. United States, supra, that the failure of any state to appear as a friend of the court to protest the enforcement of the Sherman Act, was significant, the attorney general of Colorado filed in this cause a brief as amicus curiae, calling attention to these statutes and regulations and contending that the fair trade contracts described in the indictment were entered into under the Fair Trade Act and the Liquor Code, that they are removed from the regulation and control of the United States, and that they are subject exclusively to the control and operation of the law of Colorado.

The agreement as pleaded in the indictment in this case was essentially one to fix and maintain prices at which alcoholic beverages shall be sold at retail in Colorado. Under regulation 12 C, supra, it is impossible for a retailer in that state to buy liquor from a producer. He can purchase it only from a wholesaler licensed under the laws of the state. Before liquor produced in other states can be acquired from the wholesaler title vests in the wholesaler at the time it crosses the state line coming into the state, and the required stamps must be affixed by the wholesaler. When it comes to rest in the ownership and custody of the wholesaler, is placed in the warehouse of the wholesaler for local disposition to the retailer, and is commingled with other merchandise, it ceases to be an integral part of interstate commerce. Industrial Ass'n v. United States, supra; Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Higgins v. Carr Bros. Co., 317 U.S. 572, 63 S.Ct. 337, 87 L.Ed. 468; Jewel Tea Co. v. Williams, 10 Cir., 118 F.2d 202; Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172; Walling v. Goldblatt Bros., 7 Cir., 128 F.2d 778; Allesandro v. C. F. Smith Co., 6 Cir., 136 F.2d 75, 149 A.L.R. 382. And sales subsequently made by the wholesaler to retailers and in turn by retailers to the consuming public are wholly intrastate transactions. Jewel Tea Co. v. Williams, supra.

The control of the handling, the sales, and the prices at the point of origin before movement in interstate commerce begins, or in the state where it ends, may in some circumstances directly and unduly burden interstate commerce. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; Local 167, International Brotherhood of Teamsters v. United States, supra. But here it is not charged that the parties agreed and conspired to fix and maintain prices at which producers or others outside Colorado should sell their products to wholesalers within the state. Neither is it charged that it was a part of the agreement that producers should establish uniform prices from all producers and distillers to all wholesalers in Colorado of certain types, ages, or qualities of liquor moving in interstate commerce. No charge of that kind direct or by fair inferences is to be found in the indictment.

True, it is charged that it was part of the agreement that the retailers patronize only those producers and wholesalers who enter into fair trade contracts and withhold their patronage from those who fail to do so; that the retailers agree with the producers and wholesalers that retailers selling at prices lower than those established in the fair trade contracts be deprived of the opportunity to purchase from the defendant producers and wholesalers; and that the defendant retailers threaten to boycott and do boycott producers and wholesalers who supply their products to

retailers failing or refusing to observe such retail prices, mark-ups, and margins of profits. But the words "patronize" and "patronage" as used clearly refer to the purchase of beverages from producers and wholesalers. And it is perfectly obvious that these allegations are completely innocuous and ineffective in charging an offense under the Sherman Act for the reason that retailers in Colorado cannot purchase from producers, and sales from wholesalers to retailers in that state are exclusively intrastate transactions.

The second count is completely barren of any allegations of fact effectively charging that the combination and agreement was one directly and substantially to restrict or burden the free and untrammeled flow of interstate commerce. The combination as pleaded was one necessarily intended to affect only intrastate activities. Its sole objective was control of domestic enterprise within the state, and it spent its direct and substantial force upon intrastate activities. Its effect, if any, on interstate commerce was indirect, insubstantial, and incidental. A combination of that kind lies beyond the reach of the Sherman Act.

The judgments in Numbers 2792 to 2799, inclusive, are severally reversed and the causes remanded with directions to dismiss the indictment as to these appellants; and the judgments in Numbers 2807 and 2808 are severally reversed and the causes remanded with directions to overrule the demurrers.

PHILLIPS, Circuit Judge (dissenting).

I dissent from that part of the opinion which upholds the sufficiency of the indictments in Numbers 2807 and 2808.

It is not sufficient to charge a conspiracy in general terms. The unlawful agreement and the unlawful purpose must be set forth with sufficient particularity to enable the defendant to ascertain from the charge itself what he is called upon to answer, to prepare his defense and get the witnesses to meet the charge and, if necessary, to plead the judgment on such charge as a bar to a second prosecution for the same offense. "A crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances." Every element of the offense "must be accurately and clearly alleged." United States v. Cruikshank, 92 U.S. 542, 558, 23 L.Ed. 588.

In Number 2807 the indictment alleges that the defendants engaged in a conspiracy from on or about January 1, 1920, until January 20, 1943, a period slightly in excess of 23 years; that the defendants carried on their business through 2825 stores, in 1029 towns, in 20 states and in the District of Columbia; and that the conspiracy was carried out in part in the District of Kansas, and "in many states of the United States."

In Number 2808 the indictment alleges that the defendants engaged in a conspiracy from January 1, 1917, to January 20, 1943; a period slightly in excess of 26 years; that the defendants carried on their business through 3422 stores, in 19 states; and that the conspiracy was carried out in part in the District of Kansas, and "in many states of the United States."

At the oral argument, counsel for the government admitted it did not rely upon an express agreement or conspiracy, but upon acts and circumstances from which a conspiracy may be implied. In neither indictment is the time, place, and circumstances of the alleged long-continuing conspiracies set forth with particularity. It follows that the defendants in each case must be prepared to defend their entire conduct with respect to the matters charged against them over a period of approximately a quarter of a century, and in a great number of cities and towns throughout a large number of the states of the United States. To prepare a defense to the charges laid would be most difficult if not impossible. It imposes an unnecessary burden which can and should be avoided. The sufficiency of an indictment should be determined by practical, not purely technical, considerations. The test should be, does it, under all the circumstances of the case, tell the defendant all that he needs to know to enable him to prepare his defense, and does it so specify that with which he is charged that he will not be in danger of being a second time put in jeopardy?[1]

I agree that it is not necessary to plead, with particularity, the time, place, and circumstances of the manner and means of effecting the objects of the conspiracy. Glasser v. United States, 315 U.S. 60, 66, 62 S. Ct. 457, 86 L.Ed. 680. But it does seem to

---

[1] Hill v. United States, 4 Cir., 42 F.2d 812, 814; Center v. United States, 4 Cir., 96 F.2d 127, 129; Hewitt v. United States, 8 Cir., 110 F.2d 1, 6.

me that the time, place, and circumstance of the unlawful agreement should be pleaded with particularity. Paragraph 23 of the indictment in Number 2807 and Paragraph 20 of the indictment in Number 2808 do plead the terms of the alleged unlawful agreements. But neither alleges them with any particularity as to time, place, or circumstance, leaving the government free to prove acts and conduct from which it will ask the jury to infer the unlawful agreement, in Number 2807 limited only with respect to time to a period in excess of 23 years and with respect to place within 20 states of the Union and in the District of Columbia, and in Number 2808 limited only with respect to time to a period in excess of 26 years and with respect to place within 19 states of the Union. One of the terms of both the conspiracies as charged is that the defendants would select local areas wherein they would use their dominant advantage to injure and destroy the competition of independent grocers, meat dealers, and small local food stores. Another term of both of the conspiracies as charged is that the defendants would systematically prevent competition in selected trade areas. The government expects to prove facts and circumstances from which it will ask the jury to infer that the defendants so agreed and conspired. If the unlawful agreement was an implied one, arising out of acts and conduct on the part of the defendants, then the time and place of the unlawful agreement were coincident with the time and place of such acts and conduct, and that time and place should be alleged in the indictments.

I see no reason why the government should not allege, and, indeed, it seems to me it should be required to allege, in each indictment, with reasonable particularity the period within which it expects to prove the acts and conduct from which such term of the conspiracy may be implied, and with reasonable particularity the place or places at which such acts and conduct took place. The same is true with respect to the other terms of the conspiracy alleged in Paragraph 23 in Number 2807 and the terms of the conspiracy alleged in Paragraph 20 in Number 2808. If the exact time was unknown to the grand jurors, that fact could be alleged, but with reasonable approximation the government should be able to allege the period of time within which such acts and conduct occurred and the place or places where they occurred. I do not

mean that the government should have alleged the acts and conduct, but rather that it should have alleged the time and place of such acts and conduct, as for example, "in continuation of, and as a part of the same combination and conspiracy, the defendants between the first day of December, 1926, and the first day of December, 1927, the exact date being to the grand jurors unknown, in the states of Ohio and California, the exact places being to the grand jurors unknown, conspired and agreed to select local areas wherein they would use their dominant advantage to injure and destroy the competition of independent grocers, meat dealers, and small local food stores." The times and places in the example, of course, are improvised. By so doing, the government would meet the requirements laid down in the Cruikshank case that the acts and the intent which make up the crime must be set forth in the indictment with reasonable particularity as to time, place, and circumstance.

There are practical reasons why the requirement of particularity should be strictly adhered to in a conspiracy charge. It is a well-known fact that the preparation of a defense to a conspiracy charge imposes a most difficult task and the government should not be permitted to increase that difficulty by resorting to general allegations in the indictment.

Both indictments charge a conspiracy "to restrain interstate trade and commerce in food and food products." In neither indictment is the phrase defined with particularity. The food and food products dealt in by the defendants embrace a vast number of items. It seems to me that the indictments should charge the general categories of food and food products, as for example, "fresh fruits and vegetables," "canned fruits and vegetables," "coffees, teas, and spices," so that the defendants will know the categories of food and food products with respect to which they are charged to have conspired to restrain interstate trade and commerce, and thus be able to prepare their defense.

For the foregoing reasons, and the reasons stated by Judge VAUGHT in his dissenting opinion filed to the first opinion, now withdrawn, in Numbers 2807 and 2808, it is my opinion that the demurrers to the indictments were properly sustained. A copy of such dissenting opinion is appended hereto.

VAUGHT, District Judge (dissenting).

This opinion pertains to Cause Number 2807 in its analysis but applies to Cause Number 2808 as to final results.

The indictment is in two counts. The first count charges an unlawful conspiracy to restrain interstate trade and commerce in the manufacture, distribution and sale of food products in many states of the United States in violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1. The second count charges an unlawful combination and conspiracy to monopolize interstate trade and commerce in the manufacture and distribution of food and food products in many states of the United States in violation of Section 2 of the Sherman Act, 15 U.S.C.A. § 2. Demurrers to the indictments were sustained and the plaintiff has appealed.

The indictment is long and complicated. The charging part of the first count is contained in paragraphs 22 to 27, and in the second count in paragraphs 28 to 33.

An indictment for conspiracy is probably the most difficult pleading a prosecutor is called upon to prepare. The very nature and character of the crime are such that it is conceived and executed under cover, and often can only be proved by piecing together the overt acts and the means employed by the defendants in devising and carrying out the scheme. There are two general classes of conspiracy. One, a conspiracy to commit a crime, and one, in which the conspiracy itself constitutes the crime. One of the most satisfactory definitions of conspiracy, so far as it pertains to the case at bar, is found in Pettibone v. United States, 148 U.S. 197, 203, 13 S.Ct. 542, 545, 37 L.Ed. 419, where Mr. Chief Justice Fuller said:

"A conspiracy is sufficiently described as a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means, and the rule is accepted, as laid down by Chief Justice Shaw in Commonwealth v. Hunt, 4 Metc. (Mass.) 111, [38 Am.Dec. 346], that, when the criminality of a conspiracy consists in an unlawful agreement of two or more persons to compass or promote some criminal or illegal purpose, that purpose must be fully and clearly stated in the indictment; while if the criminality of the offence consists in the agreement to accomplish a purpose, not in itself criminal or unlawful, by crim-

inal or unlawful means, the means must be set out."

In United States v. American Naval Stores Company et al., C.C., 172 F. 455, 460, the court well said:

"The gist of the offense is the unlawful agreement."

Thus, in the case at bar, the gist of the offense is the unlawful agreement.

The indictment brings the accused into court. From that document he must determine *what* specific acts he is charged with having committed; *where, when* and *how* he is charged with having done the act. Crime is made up of acts and intent. Prosecutors, sometimes, in their zeal and ambition to protect the public, overlook the fact that it is their duty not only to prosecute the guilty, but to protect the innocent from the embarrassment and expense of defending a groundless accusation. In recognition of this tendency and in order to throw about the citizen proper safeguards against it, the Fifth and Sixth Amendments to the Constitution were adopted. They provide, so far as pertinent here, that:

"No person shall * * * be deprived of life, liberty, or property, without due process of law * * * nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; * * *."

and

"In all criminal prosecutions, the accused shall enjoy the right * * * to be informed of the nature and cause of the accusation; * * *."

When a grand jury returns an indictment, it is presumed to be in possession of all the facts that are necessary to constitute the offense. If it is not, the indictment should not have been returned. The prosecutor who draws the indictment is equally advised, and there is no occasion for vagueness, lack of clarity, or ambiguity in the language employed in framing the charge in the indictment. It should be sufficiently definite, clear and simple that a layman can easily comprehend it.

Our courts have always been zealous to safeguard the rights of the citizen in this regard, fully recognizing the gravity of the situation confronting one charged with a crime. His life, his property, his good name may all depend upon the facts pleaded in the indictment. The Constitution guarantees to the citizen the right to be informed of the nature and cause of the

accusation, and one must be able to ascertain the facts from the charge filed against him. Rather early in our history the courts began to express their views on the subject in clear and concise language. Probably the whole subject has been no more clearly expressed than in that landmark decision, United States v. Cruikshank et al., 92 U.S. 542, 557, 23 L.Ed. 588, when the court said:

" * * * the accused has the constitutional right 'to be informed of the nature and cause of the accusation.' * * * the indictment must set forth the offence 'with clearness and all necessary certainty, to apprise the accused of the crime with which he stands charged;' and * * * *every ingredient* of which the offence is composed *must be accurately* and *clearly alleged.'* * * * The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defence, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. For this, facts are to be stated, not conclusions of law alone. A crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances." (Emphasis supplied.)

Counsel have cited many authorities, but when they are read in the light of the facts involved in each particular case, the principle remains the same. It is quite simple. What, where, when, and how, are the questions to be answered in every criminal charge. The defendant must be able to secure the answers to those questions from reading the indictment. He is not required to guess at any of them.

What does the indictment say in this case? In the first paragraph of count one, which is adopted by reference in count two, it is charged that

"Each of the allegations hereinafter contained in this count shall be deemed to refer to the period of time beginning on or about January 1, 1920, the exact date being to the Grand Jurors unknown, and continuing thereafter up to and including the date of the presentation of this indictment, unless otherwise expressly stated."

The record discloses that the indictment was presented December 7, 1942. Thus, the defendants are apprised that the period of time covered is 22 years. From the memorandum opinion of the trial court (R. 49), we are informed the indictment contains 30 pages and is made up of 33 separately numbered paragraphs. Many of the paragraphs have several subdivisions. The charging part of the indictment is contained in paragraphs 22 to 27, charging restraint of trade, and paragraphs 28 to 33, charging monopoly. The other paragraphs are made up of definitions, and the nature, extent, organization and growth of the business of the defendants.

The indictment discloses that the defendant Safeway Stores, Incorporated, in 1941, had 2825 stores in 1029 towns in various parts of the United States. Paragraph 22 charges as follows:

"For many years prior to the return of this indictment, and continuously up to and including the day of the finding and presentation of this indictment, defendants, and other persons to the grand jurors unknown, well knowing all the facts alleged in this indictment, have wilfully and unlawfully formed and carried out, in part within the District of Kansas, First Division, a wrongful and unlawful combination and conspiracy to unduly, unreasonably and directly restrain interstate trade and commerce in food and food products, produced, distributed and sold in many states of the United States, in violation of Section 1 of the Act of Congress of July 2, 1890, * * * the Sherman Act."

Paragraph 23: "The aforesaid combination and conspiracy has consisted in a continuing agreement and concert of action among the defendants, the substantial terms of which have been:

"a. That the defendants acquire by merger and otherwise the business of independent retail grocers and local chains throughout the United States.

"b. That the defendants select local areas throughout the United States wherein they use their dominant advantage to injure and destroy the competition of independent grocers, meat dealers and small local food chains," (No place is named here.)

"(1) By selling at retail in those areas sufficiently lower than elsewhere, until control or the desired percentage of total retail business is obtained, using the income from other areas and from operations of the business other than retail, to offset the

losses or reductions in profits incident to such price cutting." (No "areas" are named here and in vain would defendants ask where all of this was to be done.)

"(2) By combining with other national food chains, operating in such selected areas, to fix, maintain and follow the prices established by defendants." (What "selected areas" and where were they located?)

"c. That defendants systematically prevent competition in selected trade areas throughout the United States," (How are the defendants to know or ascertain from this charge, where such "selected trade areas" are located "throughout the United States"?)

"(1) By combining with the independent grocers and local and national food chains operating therein to fix the retail prices and terms upon which food would be sold in such areas," (What "independent grocers and local and national food chains" and where are they located, and what "food" would be sold in such areas?)

"(2) By combining with manufacturers of food and food products and others to fix and maintain the resale prices and policies in such selected areas and to aid and assist such manufacturers and others in enforcing the resale prices so fixed and established, * * *." (What "manufacturers," and where are they located, and what "food and food products" are meant here? Who are the parties designated as "others"; where located; and what "policies" are to be maintained?)

Thus the indictment runs throughout its 30 pages. Under paragraph 23, subdivision d, are listed eight charges in which the word "suppliers" is used, but nowhere in the definitions in the indictment is this term defined. The defendants can only guess with whom they are charged with dealing here, and can only guess where they are located. Subdivision e mentions "competitors" without naming them in any instance or locating them, again leaving the defendants to guess, who is meant or where they were located, except that they were somewhere within the broad confines of the United States. Subdivision (2) of subdivision e of paragraph 23 reads:

"By organizing, financing and preparing publicity and propaganda for false front farmer, consumer and housewife organizations, civic clubs and other organizations, and using the statements of such organizations in support of such false comparisons and reports as to prices, values and services offered by defendants and their competitors."

What is meant here by "false front farmer, consumer and housewife organizations?" What "civic clubs" and "other organizations?" They are not named and their location is undisclosed. Subdivision e (3) reads:

"By the systematic practice of secretly enhancing their actual prices above their advertised prices through short-changing, short-weighing and marking up prices on store tags and purchases."

In which of the 2825 stores did these things occur? How can the defendants know from reading the charge? Or was it meant to charge that they occurred in each store every day for 22 years? Paragraph 24 might so indicate and the defendants could not be certain until the trial. It reads:

"During the period of time covered by this indictment, and for the purpose of forming and effectuating the aforesaid combination and conspiracy, the defendants, by agreement and concert of action, have done the things which, as hereinbefore alleged, they conspired to do."

As the defendants read this indictment and attempt to comprehend it for the purpose of preparing a defense to the charges, which leave so much to speculation, in what situation are they placed? They have 2825 stores located throughout the United States, doing business every day, making millions of sales each year. If just one act a day in each store was contemplated by the charge, it would mean 1,031,125 acts to be checked in order to be safe in the preparation for trial. An indictment charging one with a crime must be more definite than that. A defendant has a right to be specifically charged.

It is agreed that the conspiracy is the crime here, and that overt acts need not be charged, but the vice of the indictment is that in seeking to charge elements of the agreement, the charge becomes vague, ambiguous and so utterly confusing that neither the defendants nor the court can comprehend it. The defendants could be prosecuted many, many times on the same charge, and could not successfully plead a former conviction or acquittal under such a charge.

Paragraph 25 seeks to designate the effect of the conspiracy, and practically every sentence therein is a conclusion of the pleader.

Paragraph 26 has to do with the "jurisdiction and venue" and presents a rather novel situation. It reads:

"The combination and conspiracy herein alleged has been entered into and carried out in part within the District of Kansas and within the First Division thereof, where the defendant Safeway Stores, Inc., a Nevada corporation, has retail food stores, offices, and agents, and transacts business. During the period of said combination and conspiracy and within three years next preceding the presentation of this indictment, the defendants have performed within the District of Kansas and within the First Division thereof .many of the acts set forth in Paragraph 23 hereof. Particularly, the said defendants have continuously since September 1, 1939, and down to the present time, advertised food and food products in Kansas City, Kansas, and elsewhere in the state of Kansas, below cost and below the price charged by them for similar products in other locations, for the purpose and with the intent of injuring and destroying competition of independent concerns and local chain stores."

Here, for the first time, we find a date that apprises the defendants of the time some specific act, which is claimed to be unlawful, is charged to have occurred. It is charged that the combination and conspiracy alleged has been "entered into and carried out in part within the District of Kansas." It will be observed that the indictment alleges, in the beginning of the charge, that the conspiracy was formed 22 years ago. Is it intended, now, to be charged that it was so formed in part in Kansas 22 years ago, or is it intended to charge that it was entered into in part in the state of Kansas in the past three years? Again, the defendants must guess or speculate. But particularizing, it is charged that within three years next preceding the indictment, the defendants have performed many of the acts set forth in paragraph 23 within the state of Kansas. What, specifically? The defendants have a right to be informed.

Then further particularizing, it is charged that the defendants have continuously since September 1, 1939, down to the date of the presentment of the indictment "advertised food and food products" in Kansas City, Kansas, "and elsewhere in the state of Kansas," below cost and "below the price charged by them" for "similar products" in "other locations" for the purpose and intent of injuring and destroying "competi-tion" of "independent concerns" and "local chain stores."

What is intended by the phrase, "food and food products," in this connection? How can the defendants know what is meant to be charged? "Food and food products" cover a wide field. The defendants must defend against this charge. They are continuously dealing in perishable "food and food products"; they must be continually on the alert to maintain their stocks of food and food products in a merchantable condition. This, of necessity, when dealing with perishable goods, calls for prompt action in each store, regardless of what the condition may be in other like stores, there, or in other localities.

It is charged that the advertisement was in Kansas City, Kansas, and "elsewhere in the state of Kansas." Where? It is charged that the advertisements were "for the purpose and with the intent" of injuring and destroying "competition of independent concerns and local chain stores." Naturally, the defendants again inquire, what "independent concerns" and what "local chain stores" and where?

Count number two charges "combination and conspiracy to monopolize" in the same language as count number one.

An indictment for conspiracy to restrain interstate trade and commerce is governed by the same rules of law as any other offense. It is not enough to allege the crime in the words of the statute. To charge one with "murder," "burglary," or any other crime, the elements of the offense must appear, as hereinbefore designated. If any of these elements in such cases is absent in the charge, then the charge is defective.

It is true that in a conspiracy charge such as we have in the case at bar, the agreement itself is the crime, but one has the right to know and be informed by indictment which charges it, where and when the ageement was formed and what its elements were.

This court has consistently held that the place of an alleged offense must be charged with particularity. In Skelley v. United States, 10 Cir., 37 F.2d 503, it held:

"Indictment charging that defendant at Oklahoma City willfully, unlawfully, and fraudulently received, concealed, bought, and facilitated transportation and concealment after importation of smoking opium, under 21 U.S.C.A. § 174, held insufficient for failure to designate specifically the

place where the offense was committed; nature and cause of accusation not being sufficiently stated to comply with Const. Amends. 5, 6."

In holding the demurrer to the indictment should have been sustained, the court said:

"* * * Oklahoma City has a population of about 150,000, and of course, there are innumerable places therein where the crime charged might have been committed. The police officers who made the arrest and discovered the drug in the possession of appellant gave the name of the street and the street number in their testimony, where the drug was found; but for some inexplainable reason the pleader did not put the location in the indictment. Nor did he otherwise 'earmark' the charge as Judge Booth aptly terms it in Myers v. United States, 8 Cir., 15 F.2d [977], 987 et seq., so as to separate and make certain from the general charge therein contained the particular offense of which appellant was accused and was to be put on trial."

In White v. United States, 10 Cir., 67 F. 2d 71, 79, the court followed the reasoning in the Skelley case, supra, and after a careful analysis of the leading federal cases dealing with indictments charging a conspiracy, the court concluded:

"In dealing with laws which are intended equally for the protection of the innocent as well as the punishment of the guilty, too much latitude should not be indulged solely for the purpose of arriving at a desired result in an individual case. The looseness in criminal pleading brought to light in this case should not receive encouragement through judicial sanction."

The majority opinion in the case at bar states that we must depart from the holding in the Skelley and White cases for the reason that they are out of harmony with Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 462, 86 L.Ed. 680.

An analysis of the Glasser case leads to a different conclusion. The particular count of the indictment which was under consideration, after alleging that during certain periods, Glasser and Kretske were assistant United States attorneys for the Northern District of Illinois, employed to prosecute all delinquents for crimes and offenses cognizable under the authority of the United States, and more particularly, violations of the federal internal revenue laws relating to liquor, charged in substance that the defendants conspired to "defraud the United States of and concerning its governmental function to be honestly, faithfully and dutifully represented in the courts of the United States" in such matters "free from corruption, improper influence, dishonesty, or fraud." The means were then set out in detail. The indictment contained every ingredient of the conspiracy. It charged a conspiracy was entered into by the defendants within the jurisdiction of the court, and with sufficient clarity, how, when, and where the conspiracy was formed. It left nothing for speculation or guess so far as these elements were concerned. Certain matters, as to details, might be called for, or requested by, a bill of particulars, but the indictment must always be definite and clear as to the ingredients of the offense. If these are not set out with sufficient clarity to inform the defendant what he is required to meet, it is a defective indictment. If the ingredients of the offense are not contained within the four corners of that document, nothing that might be supplied by the prosecutor by way of a bill of particulars can suffice. It was not even contended in the Glasser case that the indictment was not specific as to the elements constituting the conspiracy. The court said:

"* * * The particularity of time, place, circumstances, causes, etc., in stating the manner and means of effecting the *object of a conspiracy* for which petitioners contend is not essential to an indictment." (Emphasis supplied.)

It will be noted that this conclusion is not with respect to the elements of the conspiracy itself, but to the means of *effecting the object* of the conspiracy. The indictment contains all of the necessary elements of the conspiracy. That which the court says is not essential to be alleged in the indictment has reference to the overt acts.

In the case at bar, we are not dealing with overt acts. They are not necessary elements in the charge of conspiracy. Where allegations in the indictment are not definite in stating the alleged conspirators, the place, time and manner in which the unlawful agreement was reached, which constituted the conspiracy, the indictment is so defective that it cannot be cured by a bill of particulars.

I feel that this court in the Skelley and White cases properly stated the law and that these cases are not affected by the Glasser case, since in that case the Supreme Court, after in effect holding that the indictment alleged every necessary element

of the conspiracy, and alleged an overt act in carrying the conspiracy into effect, said the "particularity of time, place, circumstances, causes, etc., in stating the manner and means of effecting the object of a conspiracy, for which petitioners contend is not essential to an indictment."

An examination of Crawford v. United States, 212 U.S. 183, 29 S.Ct. 260, 53 L.Ed. 465, 15 Ann.Cas. 392, and Dealy v. United States, 152 U.S. 539, 14 S.Ct. 680, 683, 38 L.Ed. 545, on which the Supreme Court bases the above conclusion in the Glasser case, discloses that in the Crawford case the defendant and others were indicted for a conspiracy to defraud the United States by means stated in the indictment, and in relation to a contract between the Postal Device and Lock Company and the Post Office Department of the United States by which that company was to furnish certain satchels to the department for the use of the letter carriers in the free delivery system of the government. The indictment set out a number of acts of the defendants with minute particularity in the furtherance of the conspiracy and charged that on June 3, 1902 the defendant and Machen and one Lorenz, intending to defraud the United States, unlawfully and fraudulently conspired "knowingly, wrongfully and corruptly to defraud the United States in a dishonest manner, and through and by means of a dishonest scheme and arrangement." Then follows the full terms of the agreement. The indictment informs the defendant exactly what he is charged with having done, and when, where and how he was to consummate the conspiracy. It leaves nothing to speculation or guess and he knows with what he is called upon to defend.

In Dealy v. United States, supra, in an opinion by Mr. Justice Brewer, the court said:

"The gist of the offense is the conspiracy. As said by Mr. Justice Woods, speaking for this court, in United States v. Britton, 108 U.S. 199, 204, 2 S.Ct. 531 [27 L.Ed. 698]: 'This offence does not consist of both the conspiracy and the acts done to effect the object of the conspiracy, but of the conspiracy alone. The provision of the statute that there must be an act done to effect the object of the conspiracy merely affords a locus penitentiae, so that, before the act done, either one or all of the parties may abandon their design, and thus avoid the penalty prescribed by the statute.'

Hence, if the conspiracy was entered into within the limits of the United States and the jurisdiction of the court, the crime was then complete, and the subsequent overt act in pursuance thereof may have been done anywhere."

The construction placed by the majority opinion upon the Glasser case, which is based upon the Crawford and the Dealy cases, in my judgment, is not consistent either with the Glasser case or the cases upon which it is based.

It is with great reluctance that I dissent from the majority opinion of my distinguished friends on this court, but I have such a firm conviction that an indictment cannot be stated in legal conclusions and in terms so general and indefinite as those contained in this indictment, that I must conclude that the judgment of the lower court should be affirmed.