**UNITED STATES of America**

**v.**

**William Al GERHART.**

**Cr. A. Nos. 513 (Beckley), 522 (Beckley).**

United States District Court
S. D. West Virginia.

Oct. 1, 1967.

448

Alfred N. King, Sp. Atty. U. S. Department of Justice, Washington, D. C., Milton J. Ferguson, U. S. Atty., Charleston, W. Va., for plaintiff.

M. E. Boiarsky, Charleston, W. Va., Katz, Katz & Kantor, Bluefield, W. Va., for defendant.

## OPINION

MICHIE, District Judge.

Convicted by a jury on three counts of violating 18 U.S.C. §§ 1952 and 2,[1] William Al Gerhart moves this court in arrest of judgment and for a new trial. None of the multitudinous grounds urged in support of each of these motions, I conclude, is sufficient to warrant overturning the conviction.

It can be seen from the wording of the statute set forth above that the Government was burdened with showing that the defendant made use of a facility in interstate commerce with the intent to carry on an enterprise illegal under the laws of the state where it was located.

Advantageously located adjacent to the Greenbrier in White Sulphur Springs, West Virginia, the Colonial Club, a gaming establishment owned and operated by the defendant Gerhart, flourished for several years prior to a raid by Federal officers on September 18, 1963. The club, testified Gladys Brown, a former employee, had a seasonal operation running from April to November of each year. She had worked there beginning in September, 1961 and except for the off-season continued to be employed until July, 1963. Gambling equipment at the club, she also related, consisted of a roulette wheel, two blackjack tables, a dice table and five slot machines. Corroborating her testimony concerning the activities conducted at the club is the description of the club and the gaming operation there carried on related by Special F.B.I. Agent William B. Anderson, Jr. who had visited the club in an undercover capacity in September, 1962 and again in August, 1963. Another F.B.I. Agent, George Patterson, related at trial the substance of two conversations he had had with the defendant, one in March of 1962 and the other in May of 1963 which would lead one to believe that the defendant was engaged in conducting at the Colonial Club a gaming operation of a substantial nature which he planned to continue indefinitely. Several pa-

1. § 1952. *Interstate and foreign travel or transportation in aid of racketeering enterprises*

 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

 (1) distribute the proceeds of any unlawful activity; or

 (2) commit any crime of violence to further any unlawful activity; or

 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

 (b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

 (c) Investigations of violations under this section involving liquor or narcotics shall be conducted under the supervision of the Secretary of the Treasury.

 § 2. *Principals*

 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

 (b) Whoever willfully causes an act to be done, which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

trons of the club also testified for the Government and described the games of chance in which they had engaged while there. All the testimony adduced from these sources demonstrated that both for some time prior to, and also for some time after the dates on which the proscribed use of the mails occurred, the defendant, except for seasonal variations, continuously operated the Colonial Club as a gaming establishment.

It was customary for the defendant to cash at the Colonial Club checks drawn on out-of-state banks. Not only did he take such checks in exchange for cash, but also according to the testimony at trial he accepted checks drawn on foreign banks directly in satisfaction of gambling debts and as payment for chips. Mr. Paul Slattery, a patron of the club over Labor Day week-end, 1962, cashed with the defendant two checks totaling $200.00 drawn on the Union Trust Company, Washington, D. C. Defendant's endorsement and the stamp of the Bank of White Sulphur Springs established that these checks were negotiated there. Government witness John Crawford who had visited the club in May, 1963 issued to the defendant checks drawn on a New York bank totaling $19,000 directly to cover gambling losses. That these checks were presented for cash by the defendant at the Bank of White Sulphur Springs shortly thereafter is established by the testimony of F.B.I. Agent George Patterson who, with the consent of the bank's president, examined them after they had been presented. The Crawford checks as well as the checks of other patrons examined by Agent Patterson on May 20, 1963, and the Slattery checks previously, were, as evidenced by the notations on them, forwarded to the drawee banks through normal clearing channels. The United States mail, testified the bank president, is the means used by the Bank of White Sulphur Springs to transmit checks to the Federal Reserve Bank of Richmond, Virginia. The gravamen of the offense alleged in the two counts of Indictment No. 513 is that the defendant Gerhart used or caused to be used a facility of interstate commerce, in this case the United States mail, by causing checks to be sent by mail through the normal clearing channels.

On December 18, 1962 Special Agent William B. Anderson, Jr. received at his home in Pennsylvania what amounted to a Christmas card enclosed in an envelope. The envelope containing the card was postmarked White Sulphur Springs, West Virginia and bore the return address of the Colonial Club. The card inside which contained a facsimile of a poker chip carried the endorsement "Greetings of the Season * * * Redeemable on presentation at the Club for full value by customer only" and additional notations indicating that it came from the Colonial Club. The card bore the signature of the defendant Gerhart, affixed apparently by mechanical means. The single count of Indictment No. 522 charged defendant with the use of the mail for the purpose of sending this card which was designed to promote and facilitate the operation of the Colonial Club.

██ Of course, it was also necessary for the Government to show that the defendant's operation was carried on in violation of the laws of West Virginia. Games of unequal chance favoring the proprietor of the house are proscribed by West Virginia law. Special Agent Anderson described the odds at roulette. The odds at roulette, he explained, are 38 to 1. The Colonial Club paid 35 to 1; the disparity favored the house. Witness John Crawford, an expert on many gambling games, described the odds present in the game of craps as it was conducted at the Colonial Club. He said that a cautious, knowledgeable player could keep the odds as low as 1.4% in favor of the house; the average player, he said, generally plays in such a manner that the odds favor the house by as much as 5%. Two of the slot machines seized by the Government during the raid of September 18, 1963 were examined in the F.B.I. laboratories. F.B.I. employee Bruce Fisher, who had tested the machines thoroughly, derived statistics showing that the 25-cent machine retained ap-

proximately 27% of all monies played and that the 50-cent machine retained approximately 33% of all money inserted for playing purposes.

With the evidentiary development at trial thus chronicled, I turn to a consideration of defendant's arguments. He commences his multipronged attack by an assault upon the constitutionality of § 1952. He says that section violates the due process clause of the Fifth Amendment because the prohibited offenses are indefinite and vague; that it contravenes the Fifth Amendment's proscription against self incrimination; that it improperly proscribes a citizen's constitutionally protected right of travel; that it contravenes the due process protection of the Fifth Amendment because, dependent upon the laws of each state, it applies discriminatorily; that it exceeds the power granted Congress under the commerce clause; that it is contrary to the Tenth Amendment in that it invades the powers reserved to the states and, finally, that it violates the Eighth Amendment's proscription against excessive fines and cruel and unusual punishments.

A plenitude of decisions necessitates the immediate rejection of most of defendant's contentions; only a few require extended discussion.

■ Section 1952 is not unconstitutionally vague. Not a single portion of the statute when given an ordinary, common-sense interpretation can be considered as not affording a person notice of what he must do to violate it. This contention has many times been laid to rest. United States v. Barrow, 363 F.2d 62 (3d Cir. 1966); United States v. Zizzo, 338 F.2d 577 (7th Cir. 1964); Bass v. United States, 324 F.2d 168 (8th Cir. 1963).

■ In like fashion, defendant's argument of unconstitutional discrimination must also fail. Turf Center, Inc. v. United States, 325 F.2d 793 (9th Cir. 1963); United States v. Borgese, 235 F.Supp. 286 (S.D.N.Y.1964); United States v. Ryan, 213 F.Supp. 763 (D.Colo.1963) are but a few of the many cases which hold unequivocally that legislation which con-stitutes an exercise by Congress of its plenary power over commerce is not repugnant to the due process clause of the Fifth Amendment merely because variation in state laws produces differences in application.

■■ Assuring the demise of defendant's position that § 1952 exceeds the power of Congress over commerce are the decisions in United States v. Zizzo, 338 F.2d 577 (7th Cir. 1964) and Turf Center, Inc. v. United States, 325 F.2d 793 (9th Cir. 1963). It is beyond question that Congress has the power to deny the facilities of interstate commerce to traffic of persons or objects which it deems inimical to the general welfare. Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903); Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523 (1913). The application of this long understood principle by Turf Center and Zizzo to Section 1952 is unquestionably correct. Congress has the power under the commerce clause to make it unlawful to travel from one state to another or to use a facility of interstate commerce such as the mail to promote a gambling enterprise illegal by the laws of the state where the gambling was carried on.

■ Ample authority also refutes defendant's contention that § 1952 is an unconstitutional invasion by Congress of the powers reserved to the states. See, e. g., United States v. Barrow, 363 F.2d 62 (3d Cir. 1966); United States v. Borgese, 235 F.Supp. 286 (S.D.N.Y.1964); United States v. Smith, 209 F.Supp. 907 (E.D.Ill.1962).

■ Defendant's contention that § 1952 constitutes an unconstitutional abridgement of the right to travel is sufficiently disposed of by noting that the conviction was on the basis of the use of an interstate facility, the United States mail, and in no way concerned interstate travel. Certainly, Congress may proscribe the use of an interstate facility for illicit purposes. South v. United States, 368 F.2d 202 (5th Cir. 1966); Turf Center, Inc. v. United States, 325 F.2d 793 (9th Cir. 1963). It should also be

noted in passing, that the citizen's right to travel immediately becomes subordinate to the right of Congress to regulate interstate commerce when the travel involves the use of an interstate facility for illicit purposes. Travel, once tainted by illegality, loses any constitutional significance. Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523 (1913).

■ Whether the act of the use of an interstate facility coupled with a showing that the defendant performed acts before and after the occurrence in connection with the conduct of an illegal gambling enterprise creates a presumption that he must have used the facility with the intent to promote the illegal enterprise is the basis of defendant's next argument that § 1952 compels him to be a witness against himself. The statute nowhere makes reference to a presumption; indeed, the course of conduct amounting to a "gambling enterprise" and the commission of "thereafter acts" are all separate elements of the offense which the Government must show existed beyond a reasonable doubt. If, in the course of producing evidence to satisfy the necessary elements of the offense the inference arises that defendant's use of the interstate facility was undertaken with the intention of furthering his gambling enterprise, thus circumstantially establishing the requisite intent, there is no constitutional infirmity. The constraint upon the accused to give testimony would arise simply from the force of circumstances and not from any form of compulsion forbidden by the Constitution. See Yee Hem v. United States, 268 U.S. 178, 185, 45 S.Ct. 470, 69 L.Ed. 904 (1925).

■ As to the last of defendant's constitutional objections, it is quite clear to me that § 1952 does not violate the Eighth Amendment prohibition against cruel and unusual punishments by imposing a penalty greater than that which would be imposed by the state law for the operation of a gambling establishment. The Government has brought to my attention the case of Hemans v. United States, 163 F.2d 228 at pp. 237–238 (6th Cir. 1947), cert. denied, 332 U.S. 801, 68 S.Ct. 100, 92 L.Ed. 380, rehearing denied, 332 U.S. 821, 68 S.Ct. 152, 92 L.Ed. 397, where it is stated:

> Historically viewed, the Eighth Amendment was adopted to prevent inhuman, barbarous or tortuous punishment, though long-term imprisonment could be so disproportionate to the offense as to fall within the inhibition. We think it clear that the statutory provision for a maximum term of five years' imprisonment for fleeing a state to avoid giving testimony in a felony case * * * can not reasonably be classified as cruel and unusual punishment within a constitutional or any other sense.

The concern of Congress in enacting § 1952 was the widespread use of interstate facilities in connection with gambling and other prevalent illicit activities. That Congress chose to exact a higher punishment for the proscribed use of an interstate facility than the State of West Virginia does for the maintenance of the gambling enterprise within its boundaries is not a legitimate concern of the defendant. Only if the punishment provided was grossly disproportionate to the offense could the Eighth Amendment come into play. I find the punishment to be entirely reasonable.

The sufficiency of the indictments under which defendant was convicted is also questioned. The counts of the indictments are set out in the margin.[2]

2. Indictment No. 513: *THIRD COUNT* on or about September 4, 1962, in the Southern District of West Virginia, and elsewhere, WILLIAM AL GERHART used and caused to be used a facility in interstate commerce, to-wit, the United States Mail; with the intent to promote, manage, carry on and facilitate the promotion, management and carrying on of an unlawful activity, said unlawful activity being the operation of the Colonial Club, a business enterprise involving gambling, in violation of Chapter 61, Article 10, Section 1, of the Code of West Virginia, that is to say Keeping and Exhibiting a Gaming Table and Device; and in violation of the Common Law of the State of West Virginia, that is to say

In judging the validity of an indictment drawn under §§ 1952 and 2, I am not without assistance. In Turf Center, Inc. v. United States, 325 F.2d 793 (9th Cir. 1963), the court upheld an indictment virtually identical in form to each of the counts here in issue. Several other courts have concluded that indictments in substantially equivalent language, also couched in the terms of the statute, were constitutionally sufficient. See, e. g., United States v. Kelley, 254 F.Supp. 9 (S.D.N.Y.1966) ; United States v. Teemer, 214 F.Supp. 952 (N.D.W.Va.1963) and United States v. Smith, 209 F.Supp. 907 (E.D.Ill.1962).

Defendant urges upon me the admonishments of Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) ; Frankfort Distilleries, Inc. v. United States, 144 F.2d 824 (10th Cir. 1944) and Lauer v. United States, 320 F. 2d 187 (7th Cir. 1963) that where the statute itself does not spell out all the essential facts of an offense the indictment must do more than merely recite the statute. Clearly, then, it must have been the position of those courts upholding as sufficient indictments under § 1952 couched substantially in the statutory

language that the section did spell out all the essential elements of the offense charged. With them I agree.

 Defendant has brought to my attention a meticulously drafted indictment with the suggestion that he was entitled to one as precisely drawn. But,

The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, "and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction."

Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932). Accord, Turf Center, Inc. v. United States, 325 F.2d 793 (9th Cir. 1963). As to form, it is sufficient if an indictment is drafted as directed by Rule 7(c) of the Federal Rules of Criminal Procedure which states:

Keeping a Common Gaming House; and thereafter, in the Southern District of West Virginia, said defendant did perform and attempt to perform acts facilitating the carrying on of said unlawful activity, in violation of Title 18, U.S.C., Sections 1952 and 2.

*FOURTH COUNT* On or about May 20, 1963, in the Southern District of West Virginia, and elsewhere, WILLIAM AL GERHART used and caused to be used a facility in interstate commerce, to-wit, the United States Mail; with the intent to promote, manage, carry on and facilitate the promotion, management and carrying on of an unlawful activity, said unlawful activity being the operation of the Colonial Club, a business enterprise involving gambling, in violation of Chapter 61, Article 10, Section 1, Code of West Virginia, that is to say Keeping and Exhibiting a Gaming Table and Device; and in violation of the Common Law of the State of West Virginia, that is to say Keeping a Common Gaming House; and thereafter, in the Southern District of West Virginia, said defendant did perform and attempt to perform acts

facilitating the carrying on of said unlawful activity, in violation of Title 18, U.S.C., Sections 1952 and 2.

Indictment No. 522: On or about the 15th day of December, 1962, in the Southern Judicial District of West Virginia, and elsewhere, WILLIAM AL GERHART used and caused to be used a facility in interstate commerce, to-wit, the United States mail, with intent to promote, carry on and facilitate the promotion and carrying on of an unlawful activity, said unlawful activity being the operation of the Colonial Club, a business enterprise involving gambling, in violation of Chapter 61, Article 10, Section 1, Code of West Virginia, that is to say keeping and exhibiting a gaming table and device; and in violation of the common law of the State of West Virginia, that is to say keeping a common gaming house; and thereafter, in the Southern Judicial District of West Virginia, said defendant did perform and attempt to perform acts facilitating the carrying on of said unlawful activity, in violation of Title 18 United States Code, Sections 1952 and 2.

The indictment or information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged.

Nevertheless, convictions are no longer to be reversed because of minor and technical difficulties which do not prejudice the accused. Russell v. United States, 369 U.S. 749, 763, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).

█ Even a brief view of the indictments set forth in the margin suffices to show to any man of common intelligence that the defendant is charged in each of the three counts on or about each of the dates specified with the use himself or with causing another to use the United States mail for the purpose of aiding, facilitating, promoting or carrying on a gambling enterprise illegal under the laws of West Virginia and, further, that he performed some acts in furtherance of the illegal gambling activity subsequent to his use of the interstate facility—all in violation of 18 U.S.C. § 1952. Defendant would have these characterized as "bare bones" indictments. In reply to his contention I cite him to the comments made by Judge Paul in United States v. Teemer, 214 F.Supp. 952, at p. 957 (N.D. W.Va.1963) with respect to an indictment obviously similar to the ones here:

> Furthermore, it does not appear that these indictments contain merely the "bare bones" of the statutory language. They, and each count in 7423, give the date of the offense; the place where the unlawful activities were being carried on; the name of the establishment in which the unlawful activities were being carried on; the fact that the business enterprise involved gambling; that the offense also involved the keeping and exhibiting of gaming tables and other devices to be used, and used, in games of chance in which the chances were in favor of the keeper and exhibitor; and that it was a common law gaming house. Each indictment and each count then charges that, after traveling with the requisite intent, the defendants took part in or facilitated the promotion, management and carrying on of the above detailed gambling activities.

An indictment containing these elements, concluded Judge Paul, was a sufficient compliance with the fundamental purposes outlined in Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) ; that is, to inform the defendants of the criminal acts with which they were charged and to provide a sufficient basis to enable them to meet a subsequent indictment with a plea of former acquittal.

Reducing defendant Gerhart's contentions to detail they appear to be three in number: First, that the indictments did not specify how he used or caused to be used the United States mail; second, that they did not specify whom he caused to use the mail; and third, that they did not enumerate the "thereafter acts" required by the statute.

█ Disposing of defendant's last contention first, I refer again to United States v. Teemer, 214 F.Supp. 952 (N.D.W.Va.1963) where Judge Paul concluded that the "thereafter acts" were not the essence of the offense, the central element being the use of the interstate facility. I concur in his conclusion that the indictment did not have to descend into particulars which did not occupy an essential role in the prosecution.

█ I turn now to the assertion that the indictment should have specified in what manner defendant used or caused the mail to be used. To my knowledge there exist only a limited number of ways in which to use the mail and, therefore, it is somewhat ridiculous to assert that the failure to delineate the precise method in which the mail was used is a failure to state a necessary element of the crime charged. It is the fact of use which is essential; the question of how is merely a matter of proof. Knowledge of the Government's proof would be useful to the defendant and could be, as was done here, supplied in a bill of particulars.

The failure of the indictment to specify whom the defendant caused to use the

mail, he claims, also rises to constitutional proportions. Again, I must disagree. Defendant cites authority in support of his contention, Lauer v. United States, 320 F.2d 187 (7th Cir. 1963); but immediately he is met by a fundamental distinction. It is only necessary to specify the identity of another actor or actors when the identity of that other party bears significance to the crime alleged. When the identity of the "person to whom" such a sale is alleged is a factor, "central to every prosecution under the statute", Lauer v. United States, supra, at p. 191, then the actor must be identified. Here, on the other hand, the essence of the offense was the use of the mail. The identity of the person who placed the letter in the mail was immaterial to the offense charged; it was, in substance, merely an item of proof. Of course, with respect to the checks sent through the mail by the bank, since the mail is known to be the normal clearing channel, the indictment could have specified the bank as the agency which the defendant caused to use the facility; but this was not necessary. Concerning the mailing of the Christmas card, the specificity which the defendant requires would encumber the Government with practical difficulties which it cannot be expected to meet; that is, pinpointing the exact employee of the defendant who placed the card in the mail and subjecting itself to a possibility of variance between the proof and the indictment if it should be wrong.

■ I think that the indictment is sufficient also to afford the defendant a basis upon which to plead former acquittal. The relevant portions of the three counts are substantially that

> On or about [date] in the Southern District of West Virginia, and elsewhere, William Al Gerhart used and caused to be used a facility in interstate commerce, to-wit, the United States mail;

Had the defendant been acquitted on any one of the counts, the Government would be precluded from prosecuting him again for *any* use of the mail in furtherance of his gambling enterprise on the day specified in each count. As the Government properly points out, greater specificity would be to defendant's detriment rather than to his benefit. The use of the phrase "on or about" has traditionally been used to obviate the possibility of a technical variance and it will not broaden or narrow the scope of the indictment for former acquittal.

■ The asserted deficiency that the indictment does not plead an offense under the laws of the State of West Virginia is readily met. An indictment under § 1952 need not plead in detail the state offense. That the operation being carried on was illegal under the laws of West Virginia is an element, but not the essence, of the federal offense. Turf Center, Inc. v. United States, 325 F.2d 793 (9th Cir. 1963); United States v. Kelley, 254 F.Supp. 9 (S.D.N.Y.1966); see also United States v. Compton, 365 F.2d 1 (6th Cir. 1966). Defendant's argument that the federal indictment must follow the state procedural requirements is made without reference to authority and, I think, is also without merit. The established rule is certainly to the contrary. See, e.g., McClendon v. United States, 229 F. 523, 525 (8th Cir. 1916); McCoy v. Pescor, 145 F.2d 260, 262 (8th Cir. 1944), cert. denied, 324 U.S. 868, 65 S.Ct. 911, 89 L.Ed. 1423 (1945).

■ That each of the counts in the indictments combining 18 U.S.C. § 1952 and 18 U.S.C. § 2 state only that he "used and caused to be used" rather than "used and *wilfully* caused to be used" is urged as another reason why the indictments must be rejected as insufficient. Defendant relies upon the fact that the 1950 revision pertaining to 18 U.S.C. § 2 inserted the word "wilfully". The insertion by Congress of "wilfully" before "caused" indicates, he reasons, that an indictment embodying § 2 must speak in terms of "wilfully". Defendant's logic loses much of its force, however, when confronted by the fact that 18 U.S.C. § 2 need not even be referred to in an indictment. United

States v. Koptik, 300 F.2d 19, 22 (7th Cir. 1962), cert. denied, 370 U.S. 957, 82 S.Ct. 1609, 8 L.Ed.2d 823 (1962) citing Pereira v. United States, 202 F.2d 830, 837 (5th Cir. 1953), aff'd, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

 Section 2 of Title 18 sets out the rule that accessories before the fact or after the fact are deemed principals; it is not a statutory enactment of a criminal offense. The purpose of the section is merely to restate a well accepted principle of criminal law and to make that principle applicable to all federal crimes. The revisor's note to that section explains:

> Section 2(b) is added to permit the deletion from many sections throughout the revision of such phrases as "causes or procures".

> The section as revised, makes clear the legislative intent to punish as a principal not only one who directly commits an offense and one who 'aids, abets, counsels, commands, induces or procures' another to commit an offense, but also anyone who causes the doing of an act which if done by him directly would render him guilty of an offense against the United States.

Since the principle explicated in § 2(b) applies implicitly to all federal crimes making unnecessary any reference to the section in the indictment, I am persuaded that when reference has been made the defendant cannot complain of the omission of "wilfully". Notably, the indictment set out in footnote 2, 325 F.2d at p. 794, charging the defendants as principals under 18 U.S.C. § 2, omitted completely the phrase "caused to be used". This is the indictment approved by the court in Turf Center, Inc. v. United States, 325 F.2d 793 (9th Cir. 1963). See also United States, v. Salliey, 360 F.2d 699 (4th Cir. 1966).

 The fact that 18 U.S.C. § 2 does not charge a substantive offense, but merely defines the status of the principal as one who causes another to commit an offense is the reason why I must also reject defendant's assertion that the three counts are void for duplicity. Although differently phrased by the courts, a proper statement of the rule of duplicity is that an indictment is defective only if it charges two or more separate and distinct offenses in one count. Travis v. United States, 247 F.2d 130, 134 (10th Cir. 1957), reversed on other grounds, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961); see also Driscoll v. United States, 356 F.2d 324, 332 (1st Cir. 1966). Defendant avers that each count of the indictment is duplicitous because each charges him with both using and causing to be used the interstate facility. However, since 18 U.S.C. § 2 does not charge a separate offense, and reference to it is immaterial, defendant's argument fails at its premise. Whether he, himself, used or whether he caused another to use, or both, he is answerable only to one substantive offense—the use of the mail with intent to promote or facilitate his illicit enterprise.

 Turning from allegations of a predominantly procedural nature to a charge that the indictment does not plead an offense against the United States, defendant avows that his method of operation of the Colonial Club was not within the intended prohibition of § 1952. That section, he says, was enacted because of a Congressional desire to provide an effective weapon to combat the far-flung activities of professional racketeers and was not intended to apply to the Colonial Club, a purely local operation. This argument immediately encounters two difficulties: first, that regardless of the thought culminating in the genesis of § 1952 defendant comes clearly within the wording of the statute as enacted; and, second, the activity taking place at the Colonial Club did have, in the clear meaning of the term, substantial interstate implications. Where there is no expression of an intent by Congress to narrow the application of a statute beyond the common understanding of the scope of its language, I would not, even if I could, engraft one. Cf., United States v. Barrow,

212 F.Supp. 837 (E.D.Pa.1962). The contours of the record contain undisputed evidence that the Colonial Club catered primarily to those present at the Greenbrier—many of whom to the knowledge of the defendant came from out-of-state. Several checks arising out of gambling activities by patrons at the Colonial Club were presented by the defendant Gerhart at the Bank of White Sulphur Springs and ultimately were forwarded via a facility of interstate commerce to foreign banks. More need not be said.

The Colonial Club, explained the defendant to F.B.I. Agent Patterson at one time, has a *modus operandi* which does not violate 18 U.S.C. § 1952. This method, scrupulously followed by the defendant, was to take the checks issued by patrons in return for cash, chips, or in satisfaction of a gambling debt to the Bank of White Sulphur Springs and there, rather than depositing them, negotiate them to the bank and receive cash in return. Sometime later that day, or perhaps the next, the defendant would again come to the bank and deposit the cash either to his account or to the account of the Colonial Club.

The bank, apparently, was quite familiar with the nature of defendant's operation as he had been doing business with it for several years. As the bank president testified, a small but generally regular percentage of the checks negotiated by the defendant would be dishonored. Upon the return of such a check to the bank through the normal clearing channels, the bank would merely call the defendant who would come down and "pick the check up" giving the bank the appropriate amount of cash. Certainly, without this implicit understanding that the defendant would make good on all dishonored checks, the bank would not have permitted cashing rather than depositing by the defendant.

The intent of Congress when enacting § 1952, the defendant submits, was to exclude from the term "use of a facility in interstate commerce" the passing of checks through the mail in the normal course of clearing. He refers me to legislative history and comments from Congressmen on the nature of the bill and its intended scope.

First of all, "[w]here doubts exist and construction is permissible, reports of the committees of Congress and statements by those in charge of the measure, and other like extraneous matter, may be taken into consideration to aid in the ascertainment of the true legislative intent."

> But where the language of an enactment is clear, and construction according to its terms does not lead to absurd or impractical consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed.
> * * *

United States Missouri Pacific R.R. Co., 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322 (1929). See also Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917). To ascertain the application of § 1952 a court need not resort to legislative intent. United States v. Barrow, 212 F.Supp. 837 (E.D. Pa.1962), aff'd 363 F.2d 62 (3d Cir. 1966). Nevertheless, reference to legislative history, in this case, supports the Government's rather than the defendant's position.

To strengthen his position, defendant refers to an exchange on the floor of the House which took place August 21, 1961 and is reported at p. 16541 et seq. of the Congressional Record. He would have me construe this exchange and a letter from the Attorney General of the United States placed in the Record at that time as removing from the scope of the statute, thus immunizing him from prosecution, any case in which the passage of checks through the mail in the normal course of clearing is the interstate use charged. The debate, however, arose in the context of the scope of § 1952 as far as protection to legitimate establishments such as

banks which might by reason of their close proximity be rendering to an illegal establishment services involving use of the mail or of another interstate facility. In this context it was determined that the taking of checks by a legitimate banking house and the forwarding of those checks through clearing channels in interstate commerce would not subject the bank to prosecution under § 1952 even if it were later established that those checks represented proceeds of an illegal gambling operation. The exchange in no way purports to immunize from prosecution a person such as the defendant who, as the operator of an illegitimate enterprise, causes the use of an interstate facility by negotiating checks showing a foreign drawee to a legitimate banking establishment.

██ The presentation of the foreign checks for cash rather than for deposit, defendant additionally urges, isolates him from any excursion by those checks thereafter in interstate commerce. Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944) is the vehicle for his argument that, having received his cash, he has no further interest in the checks or their interstate travel. The Government, in opposition, directs my attention to United States v. Sheridan, 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359 (1946). *Sheridan*, I find, is most useful in defining the proper bounds of the rule announced in *Kann*. Considering the principle as it emerges from these two cases, in light of the present facts, extended discussion is not required to dispose of defendant's contention.

The proof is crystal that the defendant routinely accepted at his establishment checks which were drawn on foreign banks. To charge him with knowledge of the out-of-state locus of the drawee, it is only necessary to note that frequently it was he who placed the name and address of the bank on the check. Being a man of perhaps more than ordinary intelligence, it is impossible for the defendant to argue convincingly that a check drawn on an out-of-state bank, whether presented for cash or for deposit, did not to his knowledge travel in interstate commerce to reach the bank upon which it was drawn. Also, there can be no doubt that the defendant's method of operation was well established and that but for this or a similar prosecution would still have been conducted in a similar manner. The flow of checks from his establishment through the mail was a normal, continuous and necessary incident to the profitable conduct of his gambling enterprise.

The prosecution in *Kann* arose under 18 U.S.C. § 1341, known colloquially as the mail fraud statute. A careful reading of the *Kann* decision as well as a reference to the explanation of it in *Sheridan* shows that pivotal to a prosecution under that statute is that the mail be used in *execution* of a scheme to defraud. It was this requirement of the statute which led the Court, finding that Kann had completed the fraudulent scheme with the receipt of cash upon presentation of the check, to conclude that there was no legal basis for prosecution. *Sheridan* refines *Kann* to this essence. Confining its holding that the defendant was not responsible for interstate travel after the presentation of a check for cash to a prosecution under the mail fraud statute, the Court in *Sheridan*, noting that the National Stolen Property Act is couched in much broader language, went on to find that a defendant who received cash for forged checks drawn on a foreign bank caused those checks to be transported in interstate commerce with the required fraudulent intent. Section 1952 requires only that the use of the interstate facility be with the intent to "carry on or facilitate the carrying on" of an illegal enterprise. Thus, it speaks broadly in much the same manner as the National Stolen Property Act construed in *Sheridan*. It exacts no requirement that the mail be used "in execution" of a scheme—the limitation present in *Kann*.

The court in *Sheridan* was also impressed by the likelihood that the forged checks would be dishonored by the

drawee, and considered that the *Kann* rule would be less likely to apply when the use of the mail has a close relation to the successful execution of further illegal conduct. These factors, demonstrably present here, assure the conclusion that Gerhart's method of operation, whether he received cash, or a credit to his account, contravenes precisely the prohibitions of § 1952. The accessability of this channel of interstate commerce was essential to the continued success of Gerhart's operation. Each interstate use permitted the continuation of the gambling activity which in turn produced the necessity of a further interstate use—the process having been repeated for a number of years. Further, the facts do not support the contention that defendant's connection with a check was necessarily broken upon his receipt of cash for it. The continuous but small percentage of checks dishonored were readily satisfied by the defendant upon their return—an action on his part necessary to insure the continued availability of this channel of interstate commerce.

Evidence, admitted at trial, resulting from a search of the Colonial Club and the seizure of property from the premises as well as evidence gleaned from the inspection of checks recently cashed by the defendant at the Bank of White Sulphur Springs, raise, according to defendant Fourth Amendment questions. Briefly reviewed, the pertinent facts place the issues in perspective.

The search of the club on September 18, 1963 was pursuant to a warrant issued the day before to Special Agent Anderson by United States District Judge Ted Dalton sitting in Bluefield, West Virginia. The warrant was obtained without the knowledge of defendant on the affidavit of F.B.I. Agent Patterson. The execution of the warrant took place commencing at 10:30 A.M. the next morning when Anderson together with eight or nine federal agents went to the club and attempted to secure entrance. As the door to the club was locked and the defendant could not be located, entrance into the premises was delayed. The agents contacted defendant's attorney, Joseph Holt, and requested him to procure a key. Mr. Holt, apparently under the belief that no gambling equipment was located within, produced the requested key and admitted the federal posse. Although the club was in an inoperative condition, it did contain several items of gambling equipment which were in a dismantled and stored condition, several of which were seized. The search and the seizures gave rise to evidence introduced at trial as part of the Government's case.[3]

Referring to the Fourth Amendment to the Constitution and to Rule 41(c) of the Federal Rules of Criminal Procedure, defendant admonishes the court that an affidavit in support of a search warrant must state the grounds or probable cause for its issuance; in this case, he argues, the affidavit does not contain sufficient facts to allow a finding of probable cause. A conclusion that the warrant was invalidly issued upon less than probable cause would, of course, necessitate a new trial because of the assumed prejudicial effect to the defendant of the evidence subsequently obtained and introduced.

As probable cause must be found, if at all, only upon the contents of the affidavit, it is that to which I must look. The relevant portion of the affidavit is set forth below.[4]

---

3. All such evidence, of course, was introduced at trial over the objection of the defendant. Motions to suppress all such evidence were timely made prior to the trial and were overruled by the court at that time. Consequently, there is no doubt that the defendant's continuing objection at this time has a proper basis.

4. DESCRIPTION OF THE PREMISES TO BE SEARCHED AND THE PROPERTY TO BE SEIZED

 \* \* \* \* \*

I have been informed by Special Agent William B. Anderson, further identified hereafter, that the building is entered by way of a door located on the West

Facts, of course, are the proper basis upon which probable cause is to be ascertained; it is not sufficient that the affiant recite merely his belief

side. Immediately after entry there is a door to the left, or north, which leads directly into the gaming room. Within this gaming room is a craps table, two black jack tables, two roulette wheels and five slot machines. Located at or near the said pieces of gambling equipment are certain accessories and appurtenances to said equipment, such as dice, playing cards, cropier's sticks, boxes, dice cups and roulette marbles.

### FACTS INDICATING THE EXISTENCE OF AN UNLAWFUL ACTIVITY

On September 28, September 29 and September 30, 1962, William B. Anderson, a Special Agent of the Federal Bureau of Investigation known by affiant to have had experience in gambling matters, entered the above described Colonial Club in an undercover capacity. On those occasions he saw two black jack tables, one craps table, two roulette tables and wheels and five slot machines. On the said dates Special Agent Anderson noted gambling games in progress at the two black jack tables, the craps table and the roulette tables at one time or another. Special Agent Anderson himself engaged in the black jack games then in progress.

Various other individuals have visited the above described Colonial Club on August 6, September 3, September 8 and September 9, 1962, and on May 17, 18, and 19, 1963, and said patrons have stated that they did participate in these gambling games on these dates when interviewed at a later date by Special Agents of the Federal Bureau of Investigation. The reliability of these informants has not been established, however, they presented checks which they claimed had been cashed at the said Colonial Club in connection with their gambling activity. Examination of these checks shows that they bear the stamp of the Bank of White Sulphur Springs and are dated as being received by the Bank of White Sulphur Springs from one to three days after the informants claim to have visited the said Colonial Club. Said checks also bear the endorsement of W. Al Gerhart. W. Al Gerhart has admitted to affiant that he is the owner of the above described Colonial Club.

Mr. Harry G. Camper, Jr., United States Attorney for the Southern District of West Virginia, has informed me that the game of craps and the exhibition of slot machines for play has in the past been held by the Supreme Court of Appeals of the State of West Virginia to be a violation of Chapter 61, Article 10, Section 1 of the Code of the State of West Virginia. He has further informed me that the above described activity, is also a violation of the Common Law offense of Keeping a Common Gaming House as it is recognized in the State of West Virginia.

### FACTS INDICATING USE OF A FACILITY IN INTERSTATE COMMERCE

On May 20, 1963, affiant followed the aforementioned W. Al Gerhart to the Bank of White Sulphur Springs, White Sulphur Springs, Greenbrier County, Southern District of West Virginia, shortly after the said W. Al Gerhart made a deposit to the account of Colonial Farms, Incorporated. Examination of the checks cashed by the said W. Al Gerhart shortly after the deposit was made showed that among these checks, was a check drawn upon the Manufacturer's Hanover Trust Company, New York, New York, by John R. Crawford, in the amount of ten thousand dollars. Interview of the said John R. Crawford by other Special Agents of the Federal Bureau of Investigation established that the said John R. Crawford cashed this check at the above described Colonial Club on or about May 18, 1963, in order to engage in the game then in progress at the craps table located at the said Colonial Club. Affiant has examined a photostatic copy of this check and has seen the endorsement of W. Al Gerhart thereon. The same examination showed that the said check was paid by the drawee bank in New York, New York. I have been informed by an informant of known reliability that checks drawn on a bank in one state and deposited in a bank in another state are forwarded for collection by means of the United States Mail.

### FACTS INDICATING THAT THEREAFTER ACTS WERE PERFORMED IN FURTHERANCE OF THE UNLAWFUL ACTIVITY.

On the evenings of August 10, and August 11, 1963, and in the early morning hours of August 11 and August 12, 1963, the aforementioned Special Agent William B. Anderson again entered the above described Colonial Club in an under cover capacity. On those dates he saw the two black jack tables, two roulette tables and the craps table in intermittant use. An informant of known reliability has informed me that the same

of the existence of an unlawful activity and the presence of articles of property to be seized. Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933). Hearsay, however, if a substantial basis is presented upon which its credibility may be assessed, will permit a finding of probable cause. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); but the absence of facts from which the Magistrate may determine the reliability of the informant relegates his assertions to mere suspicions or beliefs and the affidavit will be deemed to suffer from the insufficiency condemned in Giordenello. Aquilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1963). And finally, consistent with the contents of the instant affidavit:

> where * * * circumstances are detailed, where reason for crediting the source of the information is given, and where a Magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a common sense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.

United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). A factor enhancing the credibility of secondary information, indicates *Ventresca,* is the identification of the informant as another federal agent engaged in the same investigation. Moreover, circumstantial substantiation from facts related by the affiant as being within his own personal knowledge, so prevalent in this affidavit, also will permit the Magistrate to credit the hearsay.

■■■ The determination of probable cause must be made upon the facts and circumstances present in each particular case. United States v. Ramirez, 279 F.2d 712 (2d Cir. 1960). Considering this affidavit in the practical, non-technical manner as directed by *Ventresca,* I have concluded that this is not even a marginal case; the contents of the affidavit amply allowed a finding by the Magistrate that probable cause existed.

Special Agent William B. Anderson is the principal informant upon whom the affiant relied to show the existence of gambling equipment on the premises. His reliability is well established by facts set out in the affidavit. He is specifically identified by the affiant by name and as a Special Agent of the F.B.I. known by the affiant to have had experience in gambling matters. On several occasions he entered the Colonial Club in an undercover capacity and observed gambling games then in progress. He was able to describe the interior of the club in excellent detail. Finally, he was able to identify for the affiant several persons who had conducted gambling games as employees of the club.

Anderson's information is corroborated by the personal experiences of the affiant concerning the same investigation. Affiant himself followed the de-

gambling equipment was present in the premises of the above described Colonial Club on September 11, 1963. In addition on August 6, 1963, affiant examined the recordak film records of the account to which W. Al Gerhart deposited the aforementioned checks and discovered that checks have been written on said account by the said William Al Gerhart to persons who have been identified to me by the aforementioned Special Agent William B. Anderson as employees of the previously described Colonial Club who

he has seen conducting gambling games in that establishment.

Whereupon affiant prays that a search warrant be issued to a Special Agent of the Federal Bureau of Investigation, authorizing him to conduct a search of the building known as 216 Spring Street, White Sulphur Springs, West Virginia, and take into his possession all things described herein, found on said premises to the end that the same may be dealt with according to law.

fendant Gerhart, admittedly the owner of the club, to the Bank of White Sulphur Springs and examined checks cashed by the defendant during that visit. Affiant examined a photostatic copy of one of the checks made after the check had cleared and had been paid by a drawee bank in New York.

Other F.B.I. agents, obviously participating in the same investigation, informed the affiant that the maker of the check, John R. Crawford, had told them that the check had been issued in satisfaction of a gambling debt incurred at the Colonial Club.

The affidavit, then, is based in part upon the personal knowledge of the affiant, in part upon the information supplied by Agent Anderson for whom a basis sufficient to support credibility is given, and in part upon the hearsay information from other unidentified F.B.I. agents and an unidentified informant of "known reliability". All secondary information is rendered credible by corroboration from other facts and circumstances set forth in the affidavit. Defendant's attempt to find a defect in the failure of the affidavit to specify how the information was transmitted from Anderson and the other F.B.I. agents to the affiant is reminiscent of the hypertechnical approach disapproved in *Ventresca* and which, in finding the affidavit sufficient, I explicitly reject.

Defendant does present a more serious contention when he urges insufficiency of the affidavit insofar as it relates a state of facts existing some time prior to the date on which the warrant was issued.

There is no doubt that Agent Anderson's visits to the club on the evenings of August 10 and August 11, 1963 recounted in the affidavit are sufficient to show the existence of gambling equipment as of that time. However, more than a month elapsed between that visit and the date of the affidavit. Does the recitation in the affidavit that affiant was informed by an "informant of known reliability" that "the same gambling equipment was present in the premises

of the above-described Colonial Club on September 11, 1963" serve to update the factual recitation and to cure the potential defect? I think that it does. Were the above recitation the sole source of information to support the presence of gambling equipment, I would not hesitate to rule the entire affidavit insufficient on the authority of Aquilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed. 2d 723 (1963). But this statement is not the foundation of the affidavit; the affidavit overflows with factual information from other sources indicating not only the existence of gambling equipment and gambling activity on the premises, but also that both had been present at the club for at least a year. While this may not hold true under another set of facts, I conclude that where a gambling operation has been carried on in an establishment incorporated as a club, where it has a particular locus in terms of a building and where the facts indicate a continuous operation at that location for at least a year, the Magistrate could properly conclude that in all probability the same state of facts would continue to exist. This probability, corroborated by the information received from the unidentified informant properly caused the affidavit to recite a present state of facts.

Probable cause is established by the affidavit, the issuance of the warrant was correct, and the evidence seized during the search was properly admissible against the defendant at trial.

Objection is also lodged by the defendant against the admission of evidence obtained by and resulting from Agent Patterson's examination of checks cashed by the defendant at the Bank of White Sulphur Springs on May 20, 1963. Admittedly, no search warrant was issued, but it is the position of the Government that the events then occurring did not amount to a search and further that the defendant having no interest in the checks examined has no standing to object.

The evidence shows that on the morning in question Agent Patterson followed the defendant to the Bank of White Sulphur Springs and watched while the de-

fendant completed a banking transaction at the teller's window. After defendant had left the bank, Agent Patterson approached the bank's president, Mr. Edward Johnson, identified himself as an F.B.I. agent and asked if he could see the checks which the defendant had just then given to the teller. Mr. Johnson, apparently without reluctance, immediately placed at Patterson's disposal all checks collected by the teller that morning from which Patterson extracted and examined those checks bearing defendant's endorsement.

 Defendant submits that this action taken by Agent Patterson constituted a "seizure on examination of records" and since it was directed against the defendant but was carried out without a warrant it was illegal as to him. The touchstone of the Fourth Amendment is, of course, the protection of privacy and to that end it prohibits, without a warrant, unreasonable invasions of a person's effects and papers as well as his home. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1885). Patterson's actions amounted to, I believe, an examination of records; but I do not agree that it invaded any constitutionally protected right of the defendant. The search, there is no question, was directed at the defendant, but the checks at the time Patterson received them were records of the bank. Furthermore, Patterson's entrance into the bank, a place open to the public, was completely proper, and his examination of the checks was with the permission of the bank president who, as the bank's principal officer, is surely in a position to consent to a search with respect to it. This, therefore, was not an improper search with respect to the bank, and the question may not be raised of the defendant's ability to object to a search directed at him resulting in an invasion of the rights of another.

Defendant's position is defeated by his failure at the time in question to have retained a sufficient interest in the checks to object to their examination. In the defendant's hands, of course, the checks were his property representing an equiv-

alent amount of cash. Upon presentation of the checks and the receipt of cash in return they became assets of the bank; the entire interest of the defendant in the checks, as a substitute for cash, was satisfied the moment he received the cash for them. Defendant's intention to abandon physically the checks themselves is borne out by his expectation, and perhaps even his hope, that he would never see them again. Thus, I believe it is a fair statement that at the time of Patterson's examination of the checks, the defendant retained no interest in them whatsoever.

Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) did expand the concept of standing by eliminating in large part, but not completely, the need that the defendant wishing to object to a search or seizure demonstrate a proprietary or possessory interest in the premises searched or the property seized. *Jones* as shown by Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) firmly entrenched the concept of privacy as the primary protected interest and, consequently, is equally applicable to cases not involving crimes of possession. See, e. g., Henzel v. United States, 296 F.2d 650 (5th Cir. 1961). However, where the defendant is not charged with a crime of possession *Jones* cannot be read to obviate the need for a showing of some interest in the place to be searched or the property to be seized. United States v. Bozza, 365 F.2d 206 (2d Cir. 1966).

The several cases which have related the *Jones* concept of standing to the search and seizure of papers and effects will not support a finding of standing under the instant facts. In Harlow v. United States, 301 F.2d 361 (5th Cir. 1962) the court concluded that a defendant had standing to object to an unconstitutional search and seizure resulting when private letters entrusted by him to the mail were intercepted and read by F.B.I. agents acting without a warrant. In Santana v. United States, 329 F.2d 854 (1st Cir. 1964), on the other hand, the court allowed the search of a package sent by fourth class mail placing implicit

reliance upon a consent to search flowing from the postal regulation subjecting all but first class mail to postal inspection.

In Corngold v. United St..tes, 367 F.2d 1 (9th Cir. 1966) the court found an unreasonable search and standing to object where a package placed with an airline for shipment was opened by airline employees pursuant to the request of and in the presence of customs inspectors. This was held to be a search to which the defendant shipper could object in spite of the fact that the opening of the package by the airline employees was undertaken in accordance with the terms of the airline's contract of carriage and the federal agents were effectively "volunteered" the contents of the opened package. In reaching its decision the court reasoned that the defendant had not abandoned the package, implicitly affirming that he still retained a proprietary interest in it. The mere surrender of custody to a carrier, the court found, did not forfeit the defendant's right to privacy.

Even under the *Corngold* facts, however, there is considerable dispute whether an objectionable search and seizure occurred. United States v. Blum, 329 F.2d 49 (2d Cir. 1964) is directly at war with the holding in *Corngold*. But in both of these cases, it is clear, the defendant retained a much greater interest in the article searched or seized than did the defendant in this case.

■■■ Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) cannot be read in support of the claim that all that is necessary to allow standing in a non-possession case is that a party be aggrieved—that he be the person against whom the search is directed. The complaining person still must have some interest in the premises searched or the object seized. Defendant Gerhart's only interest in the checks is that common to any person against whom a search is directed; they were articles which if introduced against him as evidence would support the Government's case. This is not enough. Elbel v. United States, 364 F.2d 127 (10th Cir. 1966).

■■ Insufficiency of the evidence to support the conviction is also claimed. Deficiencies in several specific areas are asserted. The Government's evidence, defendant contends, does not suffice to demonstrate any interstate activity, does not show that he wilfully brought about the use of an interstate facility, does not show a violation of the laws of West Virginia and does not prove that the defendant committed any "thereafter" acts. A review of the record, however, demonstrates to my satisfaction ample evidence upon which the conviction may rest.

As to indictment No. 513, the evidence leaves no doubt that the checks cashed by the defendant at the Bank of White Sulphur Springs were subsequently forwarded for collection to the banks on which they were drawn in Washington, D. C. and New York City through the Federal Reserve Bank in Richmond, Virginia. It is undisputed that a facility in interstate commerce, the United States mail, was the vehicle by which they were sent. Government Exhibits Nos. 2 and 3, checks issued by Paul M. Slattery and drawn on the Union Trust Company in Washington, D. C., show on their face that they were received by that bank in the District of Columbia. Mr. Slattery testified that the checks were returned to him in his statement of account from the bank, corroborating that they had been forwarded and paid as marked. Similarly, Government Exhibits Nos. 1 and 9, checks issued by John Crawford and drawn on the Manufacturers Trust Company in New York City, show that they were received by that bank in New York City. Mr. Crawford, like Mr. Slattery, testified that the checks were returned to him in his monthly statement. The reverse side of all checks displayed the stamp of the Federal Reserve Bank of Richmond; Mr. Johnson, the President of the Bank of White Sulphur Springs, testified that they had been forwarded to Richmond by mail. More evidence of travel in a facility of interstate commerce is unnecessary.

As to indictment No. 522, the evidence is uncontradicted that Agent William B.

Anderson received at his home in Pennsylvania during December, 1962, a letter postmarked White Sulphur Springs, West Virginia containing a Christmas card carrying a simulated poker chip and bearing notations indicating that it had been sent by the defendant or someone in his employ. Here, as above, there can be no doubt from the evidence presented that a facility in interstate commerce—the United States mail—had been used.

The record also contains evidence of several "thereafter" acts performed by the defendant following the occurrence of each instance of interstate activity. It is enough to note that the Colonial Club was operated as a gambling casino by the defendant until at least August 12, 1963—a substantial period of time after the dates on which defendant initiated the journeys of the checks through the mail. Of course, the operation of the casino during the 1963 season prior to its closing in September suffices as a "thereafter" act with respect to the December 1962 mailing of the Christmas card to Anderson.

To establish that the defendant was operating a gambling establishment in violation of West Virginia law, it was only necessary to prove that the games conducted on the premises were ones of unequal chance favoring the proprietor of the house. The Government adequately met this burden. Special Agent Anderson testified that the odds on winning at roulette were 38 to 1 while the defendant paid only 35 to 1. His testimony was detailed and he supported his computation by describing the construction of the roulette wheel. Mr. Crawford testified as an expert on the game of craps, concluding that the most favorable odds to the player in a craps game as conducted at the Colonial Club were 1.4% in favor of the proprietor of the game. Finally, Special Agent Fisher testified that the slot machines which had been exhibited at defendant's establishment retained 27% and 33% respectively of all money inserted for playing purposes. I cannot upset the jury's finding in the face of this evidence.

As to both counts of indictment No. 513, defendant contends that the evidence does not establish that he brought about the use of a facility in interstate commerce by wilfully causing the Bank of White Sulphur Springs to place the checks in the mail. As to indictment No. 522, defendant urges that the evidence in no way shows that he even caused another to place the Christmas card in the mail, much less that he wilfully did so. In neither instance is there a dispute as to the facts adduced; the parties merely argue whether the evidence brought to bear is legally sufficient to support the proposition that the defendant wilfully caused another to use the interstate facility.

Defendant's principal point with respect to the charges of indictment No. 513 is, and the evidence so demonstrates, that he purposely acted in the manner that he did specifically with the intent of avoiding prosecution under § 1952. Reasoning that to act wilfully must mean to act with evil intent and that his desire not to violate the statute is the specific negation of an evil intent he reaches the conclusion that he could not possibly have acted wilfully. The Government, of course, contests both defendant's construction of wilfulness and the reasoning by which he reaches his conclusion. The Government's position is that wilfulness in the context of this prosecution under §§ 1952 and 2 means only that the defendant must have deliberately and voluntarily negotiated the checks to the bank when he knew or reasonably should have known that in the process of clearing they would pass through the United States mail.

The Government's position is supported both by authority and by common sense. Since I adopt it as the proper definition of legal wilfulness as applied to this case, the evidence becomes clearly sufficient to support a finding of wilful conduct on defendant's part.

Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), relied upon by the defendant, contains an excellent discussion of the concept of

criminal intent; but it is not apposite here. Furthermore, there is authority supporting the view that an accused may be convicted under § 1952 even though he did not have the specific intent to violate the statute. See, e. g., United States v. Bash, 258 F.Supp. 807 (N.D. Ind.1966). But even the holding in *Bash* is not precisely apposite to the present issue. In fact, all of defendant's logic based upon his desire to remain immune from prosecution goes only to the issue of ordinary intent; that is, the intent to contravene the substance of § 1952. Wilfulness, on the other hand, is at issue only on the point of whether the defendant can be said to have wilfully caused another [the bank] to use the mail. With the problem thus refined, it appears to me that the Government's definition of wilfulness is clearly correct.

Recently, in United States v. Custer Channel Wing Corporation, 376 F.2d 675 (4th Cir. 1967), defendants, charged with using the mail for the purpose of selling and delivering unregistered securities, raised before the Court of Appeals the question of wilfulness. Citing the Supreme Court's words in United States v. Murdock, 290 U.S. 389, 394–395, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933) that "wilfully" does not necessarily mean done with a bad purpose but may be

> employed to characterize a thing done without ground for believing it is lawful * * *, or conduct marked by careless disregard whether or not one has the right so to act * * *.

the Court of Appeals considered the wilfulness requirement to be satisfied by a showing that the defendants had acted deliberately and where they knew or should have known that the use of an interstate facility would follow. Implicit in the court's holding in United States v. Zambito, 315 F.2d 266 (4th Cir. 1963) is, I think, the conclusion that this concept of wilfulness applies equally to a prosecution under §§ 1952 and 2.

The defendant Gerhart deliberately presented his checks to the bank. He knew, or reasonably should have known, that in the process of clearing they would be transmitted by mail and that upon presentation he was initiating their interstate journey. That he desired not to violate the federal law is immaterial. That he did not act with evil purpose is similarly irrelevant.

With respect to indictment No. 522 where the charge was that defendant either mailed or caused to be mailed the Christmas card containing the poker chip, there is no *direct* evidence showing that he did either one. Although ample circumstantial evidence supports only one or the other of these two possibilities, defendant argues that "wilfulness", an element of the second possibility, cannot be established by circumstantial evidence. I do not attempt to state a broad rule but hold merely that in the instant case circumstantial evidence sufficiently supports a finding of wilfulness.

The Christmas card advertising the Colonial Club reached Special Agent Anderson through the mail. It bore the facsimile signature of the defendant who during the period in question was undisputably the sole helmsman of the Colonial Club. A similar mechanical reproduction of defendant's signature was customarily found on other papers pertaining to the club. There is no suggestion that anyone other than the defendant or his employees had access to the facsimile. Nor has there been any suggestion that any of defendant's employees would have undertaken to send out the advertising card using defendant's signature without his consent. Thus, the inescapable conclusion on the facts presented is either that the defendant Gerhart himself affixed his signature to the card and placed it in the mail or, the more likely, that one or more of his employees acted to complete the task at defendant's instigation and under his supervision. This evidence was, I conclude, proper to support a conviction under the indictment, including a finding of wilfulness.

 If the Government has succeeded in proving wilfulness, which I have found that it has, defendant then urges a

material variance between the indictments and the proof in that the indictments did not charge the defendant with having "wilfully caused" the use of the interstate facility. To refute this assertion it must only be recalled that § 2 need not be referred to in the indictment. I have been shown no case in which the failure to refer to § 2 was later the foundation of a successful claim of variance. Surely, if no variance exists where the entirety of the section is omitted, none will be found where the omission is of one word.

 The decision that evidence adduced was sufficient to support a finding of wilful conduct with respect to all counts permits the further conclusion that the evidence as a whole is sufficient to support the conviction. The rule, recited by the Court of Appeals in United States v. Honeycutt, 311 F.2d 660, at p. 661 (4th Cir. 1962) is:

> that a trial judge, in passing upon a motion for a directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.

I find that the Government's proof in this case satisfies that standard.

Assigned as errors meriting a new trial are numerous events occurring during the trial itself. Most of defendant's complaints here, as well as those pertaining to the instructions treated later, do not require extended discussion. As developed in greater detail below, I can find no impropriety in the matters of which he complains.

 Where there was no showing of bias, the fact that a prospective juror's brother was employed as a Deputy United States Marshal working out of the particular court in the district where the trial was held does not support a challenge for cause. See Marshall v. United States, 293 F.2d 561 (10th Cir. 1961), cert. denied, 368 U.S. 898, 82 S.Ct. 175, 7 L.Ed.2d 94 (1961) ; United States ex rel. Cooper v. Reincke, 219 F.Supp. 733, 741 (D.Conn.1963), aff'd, 333 F.2d 608 (2d Cir. 1964), cert. denied, 379 U.S. 909, 85 S.Ct. 205, 13 L.Ed.2d 181 (1964). Nor is defendant entitled to make the jury cognizant of the difference in penalties between a gambling offense in violation of West Virginia laws and an offense in violation of § 1952. Since in the federal courts the jury's only duty is to determine guilt or innocence and sentencing is a matter purely for the trial judge, the jury need not be apprised of the possible punishment, much less of the comparative punishments of the state and federal law. Gantz v. United States, 127 F.2d 498 (8th Cir. 1942), cert. denied, 317 U.S. 625, 63 S.Ct. 47, 87 L.Ed. 505 (1942). Nor can I say, as defendant does, that prejudice resulted from the court's sustaining the objection to a question asked of the bank president as to the agency of the bank relative to a depositor. The question, when properly rephrased, was answered and, in addition, the signature card embodying the contract between the bank and Mr. Gerhart was introduced into evidence.

 Defendant objects to the introduction of testimony by witness McGeehan concerning his receipt of a Christmas card similar to that received by Agent Anderson. The objection is on the basis that the Government never established where the card was mailed and where it was received. A special instruction was given by the court after the deficiencies were brought to its attention directing the jury that since the interstate character of the mailing had not been proved by the Government, the receipt by McGeehan could not be considered as establishing a violation of the federal statute. But, at the same time the jury was also directed that McGeehan's testimony could be considered for the purpose of showing that such cards had been sent, thus supporting the testimony of Agent Anderson that he had received one. I think it clear that the evidence was admissible for this purpose and that the instruction was sufficient to dispel its use for any other. Also with respect to indictment No. 522, de-

fendant urges a general insufficiency of evidence to support the finding that defendant placed or caused to be placed in the United States mail the card allegedly received by Agent Anderson. This subject has been dealt with earlier in some detail and it is only necessary to note again here that the evidence adduced by the Government was sufficient to support the jury's finding.

■ The Government's question of Agent Patterson whether when entering the bank to examine checks cashed by the defendant it was his understanding that he could properly examine them without defendant's consent and his affirmative answer, received over the defendant's objection, would certainly have been irrelevant and probably would not have been allowed had not defendant's counsel by previous questions raised the possible inference that Patterson had been attempting to gather evidence in an insidious manner. The agent was allowed to give his answer to the question since it tended to counteract the improper inference which questions by defendant's counsel might have created. The exchange was in no way prejudicial to the defendant.

■ During his examination of witness Crawford, defendant's counsel posed the question: "I will ask you Mr. Crawford if it isn't a fact that its [the odds at dice for or against the player] the same in any legitimate gambling house within a few percentage points any place whether it be the Colonial Club or elsewhere?" The court's refusal to allow the witness to answer the question as phrased is assigned as error. The question was, without a doubt, improper. It assumed the existence of a legitimate gambling activity when the legitimacy or the illegitimacy of defendant's enterprise was one of the important issues in the case and when all evidence previously introduced tended to show *illegitimacy* rather than legitimacy.

Turning now to defendant's objections to the court's charge, I will consider those not already covered by previous discussions so that counsel may be apprised of my reasoning.

■ Defendant considers that the court's instruction on circumstantial evidence was inadequate and that the refusal to give his instruction was error. The instruction as given was precisely that approved by the Court in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). See also, United States v. Johnson, 337 F.2d 180, 204 (4th Cir. 1964), aff'd in relevant part, 383 U.S. 169, 170, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966). Furthermore, the language of defendant's refused instruction approximates almost exactly the language of the instructions disapproved in *Holland* and *Johnson*.

■ United States v. Compton, 365 F.2d 1 (6th Cir. 1966) compels the rejection of defendant's contention that the court did not adequately instruct the jury on the West Virginia gaming laws. The relevant instructions given by the court embodied the substance of the West Virginia statutes. The instructions were clear and understandable. And, furthermore, as in *Compton,* defendant did not request that the state offense be delineated with greater particularity.

Defendant launches basically related objections at the Government's proposed instructions Nos. 14, 17 and 21 which were incorporated by the court as part of its charge. He feels that each of these instructions, eliminating the objections which are treated elsewhere, are vague, abstract, and do not give the jury a proper standard upon which to judge the guilt of the accused. I must confess that even a most diligent consideration has not permitted me to find merit in his complaints. To me, the instructions clearly outline the elements of the offense of which the defendant was charged. They are clear and understandable. In addition, specifically as to Instruction No. 14, I see no way in which the granting of that instruction in its final form could have been prejudicial to the defendant.

Government's proposed instructions Nos. 15 and 19, as well as defendant's

proposed instructions Nos. 5 and 6, all of which were included by the court in its charge, dealt with the mental elements of the offense of which the defendant was charged. There were two kinds of mental elements which the Government had to show existed in this case. There was, first of all, what I shall call general intent; that is, the intent defined by the statute under which defendant was charged. Section 1952 requires that he must have used or caused to be used the interstate facility only with the *intent of carrying on, etc. his illegal activity.* The second mental element required was that of wilfulness and that is, where the defendant was charged as a principal under 18 U.S.C. § 2 it was necessary for the Government to show that he wilfully caused another to make use of the interstate facility.

As to the first element, general intent, the Government's proffered instruction No. 15 was correct and was adequate. See United States v. Compton, 355 F.2d 872 (6th Cir. 1966).

As to the second element, wilfulness, defendant's instruction No. 5 must be read together with the Government's requested instruction No. 19. As shown earlier, the concept of wilfulness necessary to charge one as a principal under § 2 in connection with a prosecution under § 1952 does not require an element of evil intent. That the defendant acted with an evil purpose when he caused the bank to make use of a facility in interstate commerce, while established by his intention to circumvent the statute, is immaterial. It would have been enough to charge that to find that the defendant wilfully caused the bank to use a facility in interstate commerce the jury had to find only that he voluntarily and deliberately negotiated the checks to the bank when he knew or reasonably should have known that use of the mail would inevitably follow. The defendant, however, may not now complain because he received an instruction more stringent on the issue of wilfulness and thus more favorable to him than the law requires.

The initial paragraph of defendant's requested instruction No. 5 reads:

An act is done wilfully if done voluntarily and purposely and with the specific intent to do that which the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

Coordinating this paragraph with Government's requested instruction No. 19, the jury was instructed that if the defendant wilfully [as defined above] did an act [the negotiating of the checks to the bank] knowing or where he should have known that the use of the mail would follow, even though not actually intended, he then caused the mail to be used. This charge adequately embodies what I have concluded is the proper definition of wilfulness.

The charges themselves are, I conclude, entirely proper and the evidence adduced is clearly sufficient to support a conviction under them. Defendant's motion for a new trial and his motion in arrest of judgment are denied.

An order will be entered in accordance with this opinion.